**Re: APPEAL OF DUNWOODY VILLAGE from the Decision of the Board of Assessment Appeals of Delaware County, Pennsylvania for the Year 2008 and Subsequent Tax Years Relating to the Property Located at 3500 West Chester Pike, Newtown Township, Delaware County, Pennsylvania Folio No. 30–00–02856–00.**

**Appeal of: Dunwoody Village, Inc.**

Commonwealth Court of Pennsylvania.

Argued May 15, 2012.
Decided July 9, 2012.

Donald E. Wieand, Jr., Bethlehem, for appellant.

Mark A. Sereni, Media, for appellee Marple Newtown School District.

BEFORE: SIMPSON, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge SIMPSON.

In this charitable tax exemption case, Dunwoody Village, Inc. (DVI or the Village), a not-for-profit corporation, appeals from an order of the Court of Common Pleas of Delaware County (trial court) that affirmed a decision of the Delaware County Board of Assessment Appeals (Appeals Board) denying it a real estate tax exemption. DVI operates a continuing care retirement community on its 85.5–acre property located in Newtown Township. It contends the trial court erred in determining that it failed to qualify as an institution of purely public charity under Article VIII, Section 2(a)(v) of the Pennsylvania Constitution because it could not satisfy the five-prong test established in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985), generally known as the *HUP* test. DVI further contends the trial court erred in upholding the denial of its exemption without considering whether DVI met the statutory criteria in the Institutions of Purely Public Charity Act,[1] commonly referred to as Act 55. For the reasons that follow, we affirm.

## I. Background

### A. Generally

#### 1. History

DVI, originally incorporated in 1915 as the Dunwoody Home, is governed by a board of 15 trustees who serve without compensation.[2] Presently, DVI operates a continuing care retirement community with three different levels of care: independent living, assisted living and skilled nursing.

DVI's origins date back to the last will and testament of William Hood Dunwoody. In the early 1900s, Dunwoody devised his family's farm in Newtown Township to certain named trustees to establish a home for indigent men. The facility became known as the Dunwoody Home.

In 1972, the Dunwoody trustees petitioned the Court of Common Pleas of Delaware County, Orphans' Division (orphans' court), seeking to construct and operate a retirement village on the undeveloped portion of the property surrounding the Dunwoody Home. In October 1972, the orphans' court granted DVI's petition "with the understanding that no person, once admitted into the retirement village, will be obliged to leave the retirement village for financial reasons...." *See* DVI Ex. 38; Reproduced Record (R.R.) at 965a.

In the early 1990s, upon the orphans' court's approval, DVI demolished Dunwoody Home and replaced it with a modern assisted living unit. DVI transferred the remaining residents from Dunwoody Home to the assisted living unit.

#### 2. Present

DVI currently maintains 239 residential units: 65 country houses and 174 apartments. *See* DVI Ex. 15b; R.R. at 778a. DVI's President and Chief Executive Officer, Sherry L. Smith (CEO) testified regarding admission to DVI's residential units. Applicants for admission to the residential units must sign a life care contract. They must submit a medical application, which is reviewed by a nurse and DVI's Medical Director. Applicants must

---

1. Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–85.

2. DVI is exempt from federal tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (relating to tax exemptions for charitable institutions).

also submit a financial application, which is reviewed by DVI's Chief Financial Officer (CFO). DVI also charges a $1,000 fee to be put on its waiting list.

If accepted, the applicants must pay a one-time entrance fee and thereafter a monthly fee. Entrance fees are either non-refundable or 50% refundable, at the applicant's option. At the time of this appeal, none of DVI's residents opted for the more expensive partially refundable entrance fee. At the low end, the 2008 non-refundable entrance fee for a single person in a 420 square-foot studio apartment was $82,000. At the high end, the 2008 non-refundable entrance fee for a couple in a 1,750 square foot, two bedroom country house was $237,000. In 2008, the monthly fees ranged from $2,203 for a studio apartment to $6,691 for a couple in two bedroom country house. *See* DVI Ex. 15b; R.R. at 778a.

DVI's CFO, Joseph Bobrowski (CFO), testified that residents with a life care contract can move through all three levels of care as needed. Their monthly fees remain the same even though they receive higher levels of care in the assisted living and skilled living units. Once admitted, DVI's residents will never be evicted for inability to pay. However, they may be evicted for willful refusal to pay despite the ability to pay.

Also, DVI residents are urged to contribute to a Residents' Reserve Fund (Reserve Fund) to provide funds for those residents who can no longer afford their monthly fee. DVI itself does not contribute to the Reserve Fund. Nevertheless, CEO testified that DVI considers this to be charitable care. *See* Notes of Testimony (NT.), 05/20/10, at 116; R.R. at 119a. In 2008, four residents were receiving support from the Reserve Fund. At the date of the 2010 hearing, two residents were

receiving support, with three or four applications pending.

DVI also maintains 81 assisted living units. Some persons are admitted from the residential units pursuant to their life care contracts. Some persons are admitted directly into these units from outside the Village. Nonresident admission to assisted living is also subject to certain financial and medical criteria. However, CEO did not know the number of persons admitted directly to assisted living or skilled nursing. *Id.* at 118; R.R. at 121a.

Nonetheless, the Dunwoody Trust, a separate entity from DVI, exists to provide financial assistance to persons who would not otherwise financially qualify for admission to the assisted living unit. *See* DVI Ex. 23; R.R. at 807a–10a. CEO testified that eight or nine persons received some assistance from the Dunwoody Trust in 2008 and 2009.

CEO further testified DVI maintains 81 beds in its skilled nursing unit. Each bed is in a private room. DVI accepts direct admissions, as well as residents under a life care contract, to the skilled nursing unit. Some are short term admissions, for physical, occupational or speech therapy. Others need long term care, such as treatment for dementia.

DVI, however, does not have a Medicaid provider agreement. Therefore, it does not accept residents under Medicaid. DVI does, however, accept Medicare. On average, it treats between 14 and 20 Medicare patients in its skilled nursing unit.

## B. Charitable Exemption Request

In 2007, Delaware County assessed DVI's real property at $31 million. DVI filed an assessment appeal for the year 2008 claiming the subject property is exempt from taxation as an institution of purely public charity. In November 2007, after hearing, the Appeals Board denied

DVI's exemption request and determined that the subject property remained taxable.

## C. Appeal to Trial Court

DVI appealed to the trial court and requested a hearing. DVI averred it is an institution of purely public charity under Section 5 of Act 55, 10 P.S. § 375, and under Article VIII, Section 2(a)(IV) of the Pennsylvania Constitution (relating to tax exemptions and special provisions). DVI further averred it is exempt from taxation under Section 204 of the General County Assessment Law[3] (relating to exemptions from taxation).

The Marple Newtown School District (Taxing Authority) appeared in opposition to DVI's appeal. It also represented the interests of Newtown Township and Delaware County, the other taxing authorities with a financial stake in the case.

 The trial court held a one-day bench trial in May 2010 at which both parties presented evidence. Thereafter, the parties submitted proposed findings of fact and conclusions of law. In June 2011, the trial court entered an order denying DVI's appeal. DVI timely appealed to this Court.[4]

## II. Issues

 On appeal here,[5] DVI contends the trial court erred in holding DVI failed to satisfy any of the five prongs of the *HUP* test. In particular, DVI asserts the trial court erred in concluding it: (a) does not advance a public purpose; (b) does not donate or render gratuitously a substantial portion of its services; (c) does not benefit

---

3. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204.

4. In October 2011, the trial court filed an opinion in support of its order. The trial court noted that an entity seeking the status of a purely public charity bears a heavy burden of proof; it must satisfy three separate tests to prove its entitlement. *Guthrie Clinic, Ltd. v. Sullivan Cnty. Bd. of Assessment Appeals*, 898 A.2d 1194 (Pa.Cmwlth.2006). First, it must satisfy all five prongs of the *HUP* constitutionality test. Under *HUP*, a purely public charity must: (a) advance a charitable purpose; (b) donate or render gratuitously a substantial portion of its services; (c) benefit a substantial and indefinite class of persons who are legitimate subjects of charity; (d) relieves the government of some of its burden; and (e) operate entirely free from profit motive. *Guthrie Clinic*.

After meeting the *HUP* requirements, the institution must satisfy the corresponding quantitative elements established by the General Assembly in Section 5 of Act 55, 10 P.S. § 375 (criteria for institutions of purely public charity). *Guthrie Clinic*. Meeting the above requirements, however, does not automatically entitle an entity to a tax exemption. *Guthrie Clinic*. Rather, the institution is also re-

quired to prove it is eligible for a charitable exemption under the appropriate county assessment law. *Id.*

Here, the trial court determined DVI failed to meet any of the five *HUP* criteria. The court also determined DVI failed to meet the requirement in Act 55 that an institution of purely public charity operate entirely free from private profit motive. Accordingly, the trial court concluded it did not err in denying DVI's appeal.

5. Our review in a real estate tax assessment appeal is limited to determining whether the trial court's findings are supported by substantial evidence or whether the trial court abused its discretion or committed an error of law. *Camp Hachshara Moshava of New York v. Wayne Cnty. Bd. For the Assessment and Revision of Taxes*, 47 A.3d 1271 (Pa.Cmwlth. 2012) (citing *Church of the Overcomer v. Delaware Cnty. Bd. of Assessment Appeals*, 18 A.3d 386 (Pa.Cmwlth.2011)). Substantial evidence is such relevant evidence as a reasonable mind may accept as adequate to support a conclusion. *Id.* The trial court is the fact finder in tax assessment cases and resolves all matters of credibility and evidentiary weight. *Id.* Thus, a trial court's findings are binding on appeal when supported by substantial evidence. *Id.*

a substantial and indefinite class of persons who are legitimate subjects of charity; (d) does not relieve the government of some of its burden; and, (e) does not operate entirely free from private profit motive. DVI also contends that to qualify as a purely public charity, it need only meet the statutory criteria of Act 55, not the *HUP* test. Thus, DVI asserts, the trial court erred in denying its appeal under the *HUP* test without consideration of the specific criteria in Act 55.

In response, Taxing Authority asserts DVI failed to preserve the issue of whether it need only comply with Act 55 by failing to raise it before the trial court. In addition, Taxing Authority contends it is entitled to counsel fees and costs under Pa. R.A.P. 2744 because DVI's appeal is patently frivolous.

## III. Discussion

### A. Trial Court Opinion Generally

#### 1. Argument

DVI first makes the general argument that the trial court erred in determining it failed to meet any of the *HUP* criteria for a charitable tax exemption. DVI contends the trial court misconstrued the *HUP* test and applied standards that no entity seeking a charitable tax exemption could possibly meet. DVI also argues the trial court erred in determining DVI did not meet Act 55's requirement that a charitable institution operate entirely free from profit motive.

Taxing Authority counters that the trial court's order must be affirmed in that the trial court did not err or abuse its discretion, and its findings are supported by substantial evidence. Taxing Authority asserts the failure to meet any one of the *HUP* requirements is fatal. Here, it maintains, the trial court correctly determined DVI failed to meet even one of the *HUP* criteria.

The County Commissioners Association of Pennsylvania (CCAP), as *amicus curiae*, or friend of the court, also urges that the trial court be affirmed. CCAP asserts DVI fails the *HUP* test by a comfortable margin; DVI does not come close to meeting several, if not all, of the *HUP* requirements.

#### 2. Analysis

Article VIII, Section 2 of the Pennsylvania Constitution provides in pertinent part:

(a) The General Assembly may by law exempt from taxation:

. . . .

(v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

Pa. Const. art. VIII, § 2(a)(v).

Prior to its 1985 decision in *HUP*, the Supreme Court determined that DVI's continuing care retirement community, as it existed in the late 1970s, did not qualify for a real estate tax exemption under Section 204(a)(3) of the General County Assessment Law, 72 P.S. § 5020–204(a)(3) (exemption for institutions of benevolence or charity). *Appeal of Marple Newtown Sch. Dist.*, 500 Pa. 160, 455 A.2d 98 (1982). There, the Supreme Court recognized that Village residents pay a hefty entry fee, depending on the size of the unit. Thereafter, they pay a monthly charge for care and service under what DVI termed its *complete life care* package. Further, DVI determines an applicant's annual income and ability to pay before admission.

In *Marple Newtown*, the common pleas court and this Court sustained DVI's exemption for its retirement care community

on the ground that the Village qualified as an institution of benevolence or charity pursuant to *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968). In reversing, our Supreme Court observed the retirement facility in *Presbyterian Homes* had three different admission plans. One plan presupposed the applicants had sufficient assets to maintain themselves for the remainder of their lives. However, the other two plans were designed for elderly persons of limited means. These plans permitted an applicant to be admitted on the strength of the assignment of old-age assistance grants. Of the total number of residents in *Presbyterian Homes,* just over a majority were admitted under the plan designed for the financially secure residents.

Conversely, in *Marple Newtown* our Supreme Court noted:

Here, however, the record is clear that financial security is a prerequisite to the admission of all residents of the Dunwoody Village. If an applicant fails to meet this prerequisite, the applicant will not be further considered. Subsidization of a resident's required charges by the Village is a remote possibility, at best, as indicated by the fact that only one resident of the Village has been subsidized since the Village has been in operation. Even when the possibility of a need for subsidization arises, the decision to subsidize is wholly within the discretion of the Village, whose other options include the termination of the care agreement. Thus, on this record, it cannot be concluded that the charitable purposes found in *Presbyterian Homes* is shared by Dunwoody Village, a private housing facility which for all practical purposes offers its residents no services beyond those which the residents demonstrate an ability to afford.

*Marple Newtown,* 500 Pa. at 165–66, 455 A.2d at 100.

Thereafter, in *HUP,* the Supreme Court established a minimum test for determining whether an institution qualifies is a "purely public charity" under Article VIII, Section 2(a)(v) of the Pennsylvania Constitution. Here, the trial court determined DVI failed to meet any of the five *HUP* requirements. We now address DVI's arguments with respect to each prong of the *HUP* test.

### B. Advance a Public Purpose

#### 1. Argument

DVI first contends the trial court erred in concluding DVI, which provides housing, living assistance, and nursing care to the elderly, does not advance a public purpose. Citing *Grace Center Community Living Corp. v. County of Indiana,* 796 A.2d 1008 (Pa.Cmwlth.2002) and *Presbyterian Homes,* DVI asserts this Court recognized that charity is not confined to the poor and may extend to the wealthy in areas where they are not able to care for themselves, such as illness or physical disability. As a provider of continuing care for the elderly at its residential living, assisted living and skilled nursing facilities, DVI contends it advances a charitable purpose.

DVI also stresses it never asks a resident to leave if they can no longer afford to pay for their care. It cites *Lutheran Home at Topton v. Schuylkill County Board of Assessment Appeals,* 782 A.2d 1 (Pa.Cmwlth.2001) for the proposition that a retirement care facility which required its residents to pay an entrance fee and show ability to pay for their services for a reasonable period of time, typically their entire stay, may nonetheless advance a charitable purpose. DVI contends the facts in *Lutheran Home* are very similar in that both DVI and *Lutheran Home* permit their residents to stay even if they

become unable to pay. As further support, DVI cites *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review*, 536 Pa. 478, 640 A.2d 380 (1994) (collection of fees is appropriate for purely public charities; they need not provide services that are wholly gratuitous).

## 2. Analysis

The trial court determined that DVI does not advance a charitable purpose. The court found that DVI's primary purpose is to lease residential space to medically and financially well-qualified seniors, not to benefit seniors in general. In fact, CEO testified DVI is really an insurance product. "People pay us an entry fee and a monthly fee, and live at Dunwoody through their lifetime. So we are insuring their long-term care." N.T. at 52, R.R. at 55a.

In *HUP*, the Supreme Court, citing *Hill School Tax Exemption Case*, 370 Pa. 21, 87 A.2d 259 (1952), reasoned that to be charitable *in the legal sense*, something must be done or given for general public use and the benefit of an indefinite number of persons. As the Supreme Court observed in *Marple Newtown*, financial security is a prerequisite to the admission of *all* residents of Dunwoody Village. To be eligible for admission to DVI's retirement community, an applicant must demonstrate an ability to afford a substantial entrance fee, as well as the monthly fees. The Supreme Court observed it is DVI's *philosophy* that each resident be able to pay for his care and services. *Marple Newtown.*

The large entrance and monthly fees DVI charges separate DVI from the institutions in the cases it cites. Rather, DVI's fees are more akin to the entrance fees and monthly fees charged by the retirement care communities in *Menno Haven, Inc. v. Franklin County Board of Assessment and Revision of Taxes*, 919 A.2d 333 (Pa.Cmwlth.), *appeal denied*, 596 Pa. 711, 940 A.2d 367 (2007). In that case, the trial court found that "Menno Haven did not benefit an indefinite class of people." *Id.* at 342. "[A] person from outside of the Menno Haven community only gains access to the services offered by Menno Haven if that person: (1) has sufficient financial resources to meet the financial requirements for admission; (2) is Medicare eligible; or (3) applies at a time when Menno Haven is willing to accept a Day One Medicaid eligible person from outside of the Menno Haven community...." *Id.* Thus, the trial court in *Menno Haven* "found that Menno Haven primarily caters to the 'well-to-do elderly'...." *Id.* at 342–43.

Our rationale in *Menno Haven* is equally applicable here. Like the retirement communities in *Menno Haven,* DVI caters to well-qualified seniors who can afford substantial entrance fees, monthly fees and other charges. Therefore, in light of *Menno Haven,* we discern no error in the trial court's determination that DVI fails the first prong of the *HUP* test because it does not advance a charitable purpose benefitting the general public. *See also W. Mass. Lifecare Corp. v. Bd. of Assessors of Springfield*, 434 Mass. 96, 747 N.E.2d 97 (2001) (where dominant purpose of institution is to benefit its members or a financially limited class of persons rather than the elderly population in general, it cannot be classified as charitable; a class of elderly persons who can pay an entrance fee ranging from $100,000 to $300,000, and have, from their remaining assets, monthly income of $2,000 to $7,000, is a limited one not drawn from a large segment of society or all walks of life).

## C. Services Donated or Rendered Gratuitously

### 1. Argument

DVI next contends the trial court erred in concluding DVI, which provided $1.78

million in uncompensated services in 2008, representing almost 7.5% of the costs of total services, does not donate or render gratuitously a substantial portion of its services. In this argument, DVI contends the trial court erred in determining DVI did not meet the second prong of the *HUP* test, or the corresponding Act 55 requirement that it donate or render gratuitously a substantial portion of its services. DVI asserts it meets the quantifiable test for community service in Section 5(d)(1)(v) of Act 55, which states:

**(d) Community service.—**

(1) The institution must donate or render gratuitously a substantial portion of its services. This criterion is satisfied if the institution benefits the community by actually providing any one of the following:

\* \* \*

(v) Uncompensated goods or services which in the aggregate are equal to at least 5% of the institution's costs of providing goods or services.

10 P.S. § 375(d)(1)(v).

Further, DVI asserts it never discharged a resident based on his or her inability to pay. As discussed above, DVI maintains it is bound by the 1972 orphans' court decree, which prohibits resident discharges based on inability to pay.

Also, DVI asserts, the Dunwoody Trust alone provided $458,000 of charitable care in 2008. The Trust provided $449,000 of charitable care in 2009. *See* DVI Ex. 55 at 7; R.R. at 1019a.

In addition, DVI explains it does not accept Medicaid patients because it does not have a Medicaid provider agreement. DVI claims the Department of Public Welfare declared a moratorium on granting new Medicaid provider agreements in Delaware County.

DVI further asserts the trial court disregarded evidence that it suffered the following net operating losses: (2003) $2,395,893; (2004) $2,920,952; (2005) $1,092,952; (2006) $1,441,251; (2007) $162,458; and (2008) $1,452,909. *See* DVI Exs. 46–51; R.R. at 966a–71a.

With regard to the community service test in Section 5(d)(1)(v) of Act 55, DVI avers it incurred the following costs for providing uncompensated good and services:

2003: $2,514,424 (12.15% of total operating expenses)

2004: $2,950,736 (13.65% of total operating expenses)

2005: $1,096,990 (5.07% of total operating expenses)

2006: $1,444,944 (6.43% of total operating expenses)

2007: $1,214,574 (5.13% of total operating expenses)

2008: $1,783,534 (7.46% of total operating expenses)

*See id.*

Therefore, DVI asserts, it satisfied the 5% minimum requirement for donation of goods and services in Section 5(d)(1)(v) of Act 55, 10 P.S. § 375(d)(1)(v). Thus, DVI urges the trial court erred in determining that it failed to show it donates or renders gratuitously a significant portion of its services.

**2. Analysis**

■ In *Menno Haven,* this Court rejected similar arguments, applying a "totality of the circumstances" test. Appellant Menno Haven claimed it donated or gratuitously rendered a substantial portion of its services because approximately 30% of its residents were Medicaid eligible, and that it lost a substantial amount of money by caring for Medicaid residents in its skilled nursing facilities. In rejecting

Menno Haven's argument, this Court stated (with emphasis added):

> With regard to Menno Haven's reliance on [*St. Margaret Seneca Place*], the trial court determined that the situation herein was not comparable to the situation in that case. We agree.
>
> As pointed out by the trial court, Menno Haven charges a hefty entrance fee and primarily services residents from within the Menno Haven community. The trial court also pointed out that Menno Haven's current population that is Medicaid eligible is far less than that maintained by St. Margaret Seneca Place which had a population that was 48.5% Medicaid eligible and that most of that population was admitted from the community at large. Accordingly, we conclude, as did the trial court, that [*St. Margaret Seneca Place*] is quite different from Menno Haven; therefore, the holding in [*St. Margaret Seneca Place*] is not controlling in this matter.
>
> *Moreover, the fact that Menno Haven loses money by caring for Medicaid patients in its skilled nursing facilities is of no moment where there is a finding, based on substantial evidence of record, that an entity does not donate or render gratuitously a substantial portion of its services.* In the present case, the trial court, in a very well reasoned opinion, recognized that the facts and circumstances of a case determine whether a contribution satisfies the 'substantial' requirement. As noted by our Supreme Court in *HUP*:
>
>> *Whether or not the portion donated or rendered gratuitously is 'substantial' is a determination based on the totality of the circumstances surrounding the organization. The word 'substantial' does not imply a magical percentage. It must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the 'usual fee.'*
>
> *HUP*, 507 Pa. at 19 n. 9, 487 A.2d at 1315 n. 9.
>
> *Based on the totality of the circumstances, the trial court determined that Menno Haven does not donate or render gratuitously a substantial portion of its services. As stated previously herein, the trial court determined that Menno Haven charges a hefty entrance fee and is caring for the Medicaid eligible residents that come from within the Menno Haven community because of an obligation to do so rather than a sense of charity or out of a bona fide effort to service those that cannot afford the per diem rate.* The trial court found further that Menno Haven only accepts a small percentage of Day One Medicaid eligible individuals from outside the Menno Haven community; specifically 17 out of 179 individuals for the period between 2000 and 2004.

*Menno Haven*, 919 A.2d at 341–42.

Our rationale in *Menno Haven* is equally applicable in the present case. In light of *Menno Haven*, we agree with the trial court that DVI failed to establish it donates or renders gratuitously a substantial portion of its services. Like the retirement care communities in *Menno Haven*, DVI charges significant entrance fees and monthly fees. DVI has no Medicaid residents. It does not appear from the facts that DVI makes a bona fide effort to service primarily those who cannot afford the usual fee.[6] Therefore, we discern no error

---

6. Nonetheless, we acknowledge that DVI admits some nonresident applicants directly into assisted living and provides *some* financial assistance for those individuals in addition to any assistance provided by the Dunwoody Trust. However, DVI provided this assis-

in the trial court's determination that DVI failed to establish that it donates or render gratuitously a substantial portion of its services. *HUP; Menno Haven.*

Additionally, even accepting that DVI suffered net operating losses in 2003–2009, this is of no moment where, as here, there is a finding that DVI did not donate or render gratuitously a substantial portion of its services. *Menno Haven.*

We also dismiss DVI's argument that it meets the gratuitous service prong because it satisfies the corresponding community service test in Section 5(d)(1)(v) of Act 55. As discussed more fully below, in *Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County Board of Assessment Appeals,* — Pa. —, 44 A.3d 3 (2012), the Supreme Court recently held that an entity seeking a charitable tax exemption under Act 55 must first satisfy the minimum constitutional requirements in *HUP* before the question of whether that entity satisfies the statutory requirements of Act 55 can be reached. Here, DVI failed the gratuitous service prong of the *HUP* test.

### D. Benefits Legitimate Objects of Charity

#### 1. Argument

DVI next contends the trial court erred in determining that DVI failed to establish that it benefits a substantial and indefinite class of persons who are legitimate subjects of charity. DVI again argues that legitimate subjects of charity need not consist of only the poor, the infirm or the needy. *See Presbyterian Homes* (charity can benefit both the wealthy and poor); *City of Washington v. Bd. of Assessment Appeals of Washington Cnty.,* 550 Pa. 175,

704 A.2d 120 (1997) (youths seeking college education qualify as legitimate subjects of charity; college relieved state government of some of its burden of providing higher education to state residents); *Unionville–Chadds Ford Sch. Dist. v. Chester County Bd. of Assessment Appeals,* 692 A.2d 1136 (Pa.Cmwlth.1997) (legitimate subject of charity are not just the destitute; for example, Longwood Gardens benefits the indefinite public because it is open to the general public, unrestricted, at a greatly subsidized admission price).

#### 2. Analysis

*Menno Haven* is also instructive, if not controlling, on the issue of whether DVI satisfies the third prong of *HUP* by showing it benefits a substantial and indefinite class of persons who are legitimate subjects of charity. As discussed above, DVI charges substantial entrance and monthly fees similar to those charged by the retirement communities in *Menno Haven.*[7] There, we recognized a person could only gain access to Menno Haven's retirement communities if he or she could meet the substantial financial requirements for admission. Thus, the residential and nursing facilities in *Menno Haven* did not benefit an indefinite class of people who were legitimate subjects of charity. *Id.*

Nonetheless, DVI asserts that all but the wealthiest senior citizens can readily become poor when confronted with the costs of assisted living and skilled nursing. However, this possibility does not save DVI from failing this prong of the *HUP* test. Financial security is a prerequisite for admission to DVI. *Marple Newtown.* "The essential feature of a public use is that it is not confined to privileged

---

tance, at its discretion, to a very small number of individuals. In 2008–09, eight or nine people received *some* financial assistance from the Dunwoody Trust and DVI.

7. Here, CFO testified that typically, residents sell their house to pay DVI's entrance fee. N.T. at 155; R.R. at 159a.

individuals, but is open to the indefinite public." *Unionville–Chadds Ford Sch. Dist.*, 692 A.2d at 1141. "It is this *indefinite* or unrestricted quality that gives it its public character." *Id.* Here, the trial court observed, DVI's beneficiaries are those senior citizens who can afford its fees and costs, not the general public. In other words, DVI's financially well-qualified clients do not constitute an indefinite class of persons who are legitimate subjects of charity. *Menno Haven.*

In contrast, we recognize that Medicaid patients are manifestly legitimate subjects of charity. *St. Margaret Seneca Place.* DVI, however, does not take Medicaid patients in its independent living, assisted living or skilled nursing units.

For these reasons, we discern no error in the trial court's determination that DVI failed to show that it benefits a substantial and indefinite class of persons who are legitimate subjects of charity. *Menno Haven.*

### E. Relieve Some Burden on Government

#### 1. Argument

DVI next contends the trial court erred in concluding it does not relieve the government of some of its burden where it provides housing, personal living assistance and nursing care to elderly citizens and promises that they will never be discharged for inability to pay. DVI asserts this prong is met where the institution bears a substantial burden that would otherwise fall to the government.

In support of its position, DVI cites Section 5(f) of Act 55, which provides in pertinent part:

(f) **Government service.**—The institution must relieve the government of some of its burden. This criterion is satisfied if the institution meets any of the following:

(1) Provides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service.

(2) Provides services in furtherance of its charitable purpose which are either the responsibility of the government by law or which historically have been assumed or offered or funded by the government.

(3) Receives on a regular basis payments for services rendered under a government program if the payments are less than the full costs incurred by the institution, as determined by generally accepted accounting principles.

(4) Provides a service to the public which directly or indirectly reduces dependence on government programs or relieves or lessens the burden borne by government for the advancement of social, moral, educational or physical objectives.

10 P.S. § 375(f).

Here, DVI argues, the services it provides to seniors are the same that Delaware County has historically provided at its senior care facility, Fair Acres Geriatric Center. DVI thus asserts the services it provides to senior citizens in its residential living, assisted living and skilled nursing units fall squarely within Section 5(f)(2) of Act 55, 10 P.S. § 375(f)(2).

In addition, CEO testified the Medicare payments DVI receives for patients in its skilled nursing unit are less than DVI's costs of providing that care. *See* N.T. at 85; R.R. at 88a. Therefore, DVI contends it also satisfies the criterion for government service in Section 5(f)(3) of Act 55, 10 P.S. § 375(f)(3).

## 2. Analysis

In *St. Margaret Seneca Place,* our Supreme Court stated (with emphasis added):

> The *HUP* test of whether an institution has relieved the government of some of its burden does not require a finding that the institution has fully funded the care of some people who would otherwise be fully funded by the government. *The test is whether the institution bears a substantial burden that would otherwise fall to the government.* The home pays a substantial portion of the cost for Medicaid patients, who comprise about half its residents; this fulfills the requirement that the home relieve the government of some of its burden.

*Id.,* 536 Pa. at 487, 640 A.2d at 385.

In *St. Margaret Seneca Place,* the Court recognized that Seneca Place was founded to relieve the shortage of nursing home beds for Medicaid patients in that area. Medicare and Medicaid payments made up 59.2% of the nursing home's revenue. But for Seneca Place, many of its Medicaid recipients would have needed to be cared for in county-provided facilities. Thus, Seneca Place relieved the government of some of its burden.

■ Conversely, DVI does not accept any Medicaid patients. Although DVI has some Medicare patients, the majority of DVI's residents would not need to reside or seek nursing care in County-provided facilities if it were not for DVI. Rather, as discussed above, DVI's residents are overwhelmingly those seniors who can afford DVI's fees and costs, not the general public. Thus, we discern no error in the trial court's determination that DVI failed to establish by credible evidence that it relieves the government of some of its burden. *St. Margaret Seneca Place. See also W. Mass. Lifecare Corp.* (where the vast majority of residents do not require government assistance with housing or health care, the institution does not relieve government of any burden).

## F. Private Profit Motive

### 1. Argument

DVI next contends the trial court erred in determining that it failed the fifth prong of the *HUP* test, which requires that an institution establish it operates entirely free from private profit motive. To that end, DVI asserts it meets the requirements in Section 5(c) of Act 55, which provides (with emphasis added):

> **(c) Private Profit motive.**—The institution must operate entirely free from private profit motive. Notwithstanding whether the institution's revenues exceed its expenses, this criterion is satisfied if the institution meets all of the following:
>
> (1) Neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals, as the private inurement standard is interpreted under section 501(c) of the Internal Revenue Code....
>
> (2) *The institution applies or reserves all revenue, including contributions, in excess of expenses in furtherance of its charitable purpose or to funding of other institutions which meet the provisions of this subsection and subsection (b).*
>
> (3) *Compensation, including benefits, of any director, officer, or employee is not based primarily upon the financial performance of the institution.*
>
> (4) The governing body of the institution of purely public charity has adopted as part of its articles of incorporation ... a provision that expressly prohibits the use of any surplus funds for private

inurement to any person in the event of a sale or dissolution of the institution of purely public charity.

10 P.S. § 375(c).

■ With respect to Subsection (2), DVI asserts the trial court erred in determining that DVI failed to establish it applies or reserves all its revenues to its charitable purpose. "[S]urplus revenue is not synonymous with private profit." *Wilson Area Sch. Dist. v. Easton Hosp.*, 561 Pa. 1, 7, 747 A.2d 877, 880 (2000) (citing *St. Margaret Seneca Place* ). Rather, "it is how such revenue is used that will determine whether it evidences a private profit motive. . . ." *Id.*

Article II of DVI's Amended Articles of Incorporation provides that DVI "does not contemplate pecuniary gain or profit incidental or otherwise to its members." R.R. at 652a. Further, Amended Article VI provides:

> In the event of dissolution or liquidation of this corporation, either voluntary, involuntary, or by operation of law, all of the remaining assets of this corporation shall distributed only for religious, charitable, scientific or educational purposes to an organization or organizations exempt from taxation under Section 501(c)(3) of the Internal Revenue Code as it now exists or may hereafter be amended.

*Id. See* also Art. II, § 2.2(d)(ii) of DVI's By–Laws (no part of DVI's net earnings shall inure to the benefit of, or be distributable to, DVI's trustees, officers or other private persons, except that DVI is author-

ized to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of DVI's stated purposes). DVI Ex. 2; R.R. at 685a.

With respect to Subsection (3), DVI contends the trial court erred in determining the compensation of its managerial employees, including its CEO, CFO, Administrator of Health Services and Marketing Director, was *primarily* based on the financial performance of the institution. The maximum incentive compensation available to management employees ranged from 18%–24%. DVI asserts the use of the term *primarily* in Act 55 dictates that 50% of the employee's compensation be based on the financial performance of the institution.

### 2. Analysis

■ To begin our analysis, we again acknowledge that in *Mesivtah Eitz Chaim*, our Supreme Court held that an entity seeking a tax exemption as an institution of purely public charity must first meet the constitutional requirements of the *HUP* test before the question of whether it satisfies the corresponding statutory criteria in Act 55 can be addressed. The *HUP* test cases, however, do not support DVI's position.

Here, the trial court found that DVI's executive compensation included incentives related to DVI's financial or marketplace performance.[8] Tr. Ct., Slip Op., at 6. Consequently, DVI's revenue is not entirely expended in furtherance of its stated charitable purpose. Therefore, the trial court

---

**8.** The trial court further found DVI provided its employees with a retirement and savings plan. *See* Taxing Auth. Ex. 18.3; Supplemental Reproduced Record at 411b–29b. Although these benefit plans do not appear excessive by themselves, we are constrained to agree with Taxing Authority that the retirement and savings plans, combined with the

financial incentives available to DVI's executives and corporate officers, also provide substantial evidence for the trial court's determination that DVI does not expend all its revenue in furtherance of a charitable purpose. Thus, DVI does not operate entirely free from a profit motive. *Guthrie Clinic.*

determined DVI failed the profit motive prong of the *HUP* test. *Guthrie Clinic.* The trial court's determination is supported by the record. CEO testified DVI's executives are compensated in part based on DVI's annual performance. *See* N.T. at 93–96; R.R. at 96a–99a (for example, CEO had maximum incentive compensation of 24%; CFO had maximum incentive compensation of 18–19%). DVI's Health Services Administrator and Marketing Director also received similar incentive-based compensation. *See id.*

In short, given that a substantial percentage of DVI's officers' and executives' compensation is based on DVI's financial or marketplace performance, we discern no error in the trial court's determination that DVI failed to establish that it operates entirely free from private profit motive. *Guthrie Clinic.*

### G. Alliance Home; Mesivtah Eitz Chaim

#### 1. Argument

DVI also contends the trial court erred in concluding DVI failed to meet the constitutional requirements for an institution of purely public charity without consideration of the criteria in Act 55. Here, DVI argues that to qualify as a purely public charity, an institution only needs to satisfy requirements of Act 55. In support of its position, DVI cites *Alliance Home of Carlisle, PA v. Board of Assessment Appeals,* 591 Pa. 436, 919 A.2d 206 (2007).

In *Alliance Home,* the Supreme Court, recognized that in enacting Act 55, the General Assembly intended to eliminate the perceived inconsistent application of eligibility standards for charitable tax exemptions. *See id.* at 464, 919 A.2d at 223. The Court then reasoned:

> If the Act 55 presumption and test would lead to a holding that that a taxpayer qualified as 'an institution of pure-

ly public charity,' where the *HUP* test would not, fundamental and foundational questions could arise concerning whether: (1) the *HUP* test, which was adopted in the absence of legislation addressing the constitutional term, occupied the constitutional field concerning the exemption, or instead. left room for the General Assembly to address the matter; (2) the legislative scheme as adopted comported with the constitutional command and displaced the *HUP* test; and/or (3) if *HUP* were deemed authoritative and comprehensive, whether the legislative findings and scheme set forth in Act 55 gave reason to reconsider the contours of the test thus distilled from judicial experience with individual cases.

*Id.* (footnotes omitted). However, the Court noted there was no constitutional challenge to Act 55 in *Alliance Home* and that the parties agreed the appellant was an institution of purely public charity. *Id.* at 465, 919 A.2d at 223–24.

In its brief, DVI recognized the issue of whether Act 55's criteria for an institution of purely public charity supplanted or superseded the *HUP* test was squarely before the Supreme Court in *Mesivtah Eitz Chaim.* Obviously hoping for a different result in *Mesivtah,* DVI preserved the issue of whether it need only meet the statutory criteria of Act 55 to qualify as an institution of purely public charity.

Taxing Authority counters that DVI waived the issue of whether it need only comply with Act 55 by failing to raise it before the trial court. Pa. R.A.P. 302(a). Taxing Authority also contends DVI waived this issue by failing to present it in its Pa. R.A.P. 1925(b) statement of errors complained of on appeal.

#### 2. Analysis

Regardless of issue preservation, our Supreme Court clearly rejected this con-

tention on the merits in *Mesivtah Eitz Chaim*. There, the Supreme Court reasoned that Article VIII, Section 2 was designed not to grant, but to limit legislative authority to create tax exemptions. To eliminate judicial review of the constitutionality of Act 55's criteria for an institution of purely public charity would defeat that purpose. *Id.* Ultimately, the Supreme Court determined:

> In the end, to receive an exemption without violating the Constitution, the party must meet the definition of 'purely public charity' as measured by the test in *HUP*. If it does so, it may qualify for exemption if it meets the statute's requirements. Act 55, however, cannot excuse the constitutional minimum—if you do not qualify under the *HUP* test, you never get to the statute.

*Mesivtah Eitz Chaim,* —— Pa. at ——, 44 A.3d at 9.

 *Mesivtah Eitz Chaim* is controlling here. Having properly determined that DVI failed to meet any of the five prongs on the *HUP* test, the trial court did not err by failing to address whether DVI met all the corresponding requirements in Section 5 of Act 55 for an institution of purely public charity.

Moreover, as discussed above, the trial court determined that DVI failed to satisfy the requirements in Section 5(c) of Act 55 for establishing that an institution operates entirely free from private profit motive. This, by itself, defeats DVI's Act 55 argument.

## H. Counsel Fees

### 1. Argument

 Lastly, we address Taxing Authority's argument that it is entitled to counsel fees and costs under Pa. P.A.P. 2744 because DVI's appeal is frivolous. The imposition of counsel fees and costs

under Rule 2744 is solely within this Court's discretion. *Canal Side Care Manor, LLC v. Pa. Human Relations Comm'n,* 30 A.3d 568 (Pa.Cmwlth.2011). An appeal is frivolous if the realistic chances of success are slight and continuation of the contest is unreasonable. *Waste Mgmt. v. Unemployment Comp. Bd. of Review,* 168 Pa.Cmwlth. 633, 651 A.2d 231 (1994).

 However, in awarding counsel fees, this Court is guided by the principle that an appeal is not frivolous merely because it lacks merit. *Canal Side Care Manor.* Rather, the appeal must have no basis in law or in fact. *Id.* Such a high standard is necessary to avoid discouraging parties from bringing appeals due to fear of being sanctioned. *Id.*

Taxing Authority asserts that the Supreme Court previously held DVI is not a purely public charity in *Marple Newtown.* In its present appeal, DVI failed to present any evidence that would necessitate a different ruling. Rather, even in the face of *Menno Haven* and other cases supporting the trial court's decision, DVI pressed its same arguments. Therefore, Taxing Authority requests counsel fees and costs for a frivolous appeal.

DVI counters that its appeal is not frivolous. Although DVI pursued an unsuccessful tax exemption appeal in the late 1970s, this should not preclude it from bringing another appeal 30 years later. DVI further asserts it paid its property taxes during the pendency of the appeal, and thus has no incentive to delay the outcome of the case.

In short, DVI emphasizes, its previous unsuccessful appeal in *Marple Newtown* predated *HUP* and Act 55. The requirements for a charitable tax exemption evolved since *Marple Newtown.* Consequently, DVI urges its present appeal is not frivolous.

## 2. Analysis

■ Given the totality of the circumstances, we reject Taxing Authority's contention that DVI's appeal is frivolous under Pa. R.A.P. 2744. The Supreme Court's decision in *Marple Newtown* denying DVI's previous request for a tax exemption for its retirement community predated the Supreme Court's 1985 decision in *HUP* and the 1997 enactment of Act 55. As such, DVI's eligibility for a tax exemption was never judicially determined under the *HUP* test or Act 55.

Further, DVI presented evidence that it met the Act 55 requirements for an exemption. In *Alliance Home,* our Supreme Court recognized that if a taxpayer qualified as an institution of purely public charity under Act 55, but not under *HUP,* fundamental and foundational questions could arise as to whether the *HUP* test occupied the constitutional field concerning the charitable exemption or whether the statutory criteria in Act 55 met the constitutional requirements and thus displaced the *HUP* test. These issues were not resolved until *Mesivtah Eitz Chaim,* which remained pending at the time DVI filed its appeal here.

Consequently, we find DVI had sufficient legal grounds for its appeal. Therefore, we reject Taxing Authority's contention that it is entitled to counsel fees and costs under Pa. R.A.P. 2744 for a frivolous appeal.

## IV. Conclusion

For the above reasons, the order of the trial court is affirmed. Further, having determined that DVI's appeal was not frivolous, we deny Taxing Authority's request for counsel fees and costs.

## ORDER

**AND NOW,** this 9th day of July, 2012, for the reasons stated in the foregoing opinion, the order of the Court of Common Pleas of Delaware County is **AFFIRMED.** The request that counsel fees and costs be assessed against Dunwoody Village, Inc. pursuant to Pa. R.A.P. 2744 is **DENIED.**