# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pottstown School District, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| Montgomery County Board of | : | |
| Assessment Appeals, Pottstown | : | |
| Hospital, LLC, Pottstown Borough | : | No. 1217 C.D. 2021 |
| and County of Montgomery | : | Argued: November 16, 2022 |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE LORI A. DUMAS, Judge

OPINION
BY JUDGE FIZZANO CANNON          FILED: February 10, 2023

Pottstown School District (School District) appeals from a decision of the Court of Common Pleas of Montgomery County (trial court) granting real property tax exemptions to Pottstown Hospital, LLC (Hospital) in several consolidated cases.[1] After thorough review, we reverse the trial court's order. We dismiss as moot Hospital's application for relief seeking to strike the briefs filed by *amici curiae* in support of School District.

---

[1] Pottstown Borough and the County of Montgomery did not file notices of appeal but filed notices joining in School District's brief.

# I. Background

In 2017, Reading Health System, now known as Tower Health, LLC (Tower Health), bought several for-profit hospital facilities and related properties formerly owned by Community Health Systems, a for-profit entity, in Montgomery and Chester Counties. Trial Ct. Op. 10/8/21 at 1-2. Tower Health, a limited liability company (LLC) with federal nonprofit status under 26 U.S.C. § 501(c)(3), created a new LLC to run each of the purchased hospital facilities as a nonprofit entity. *Id.* at 2. Tower Health is the sole member of each new LLC. *Id.* at 3. Hospital is one of the new LLCs and operates a hospital facility in Montgomery County. *Id.*

Hospital is a community acute care hospital providing a full range of health services. Trial Ct. Op. 10/8/21 at 4. Hospital also provides education and training to medical residents, participates in clinical research, and engages in community outreach programs. *Id.* at 5. Hospital operates under Tower Health's 501(c)(3) certification and is exempt from state sales and use tax as a charitable entity. *Id.* Tower Health adopts a budget for Hospital and limits the expenditures Hospital can make without Tower Health's approval. *Id.* at 5-6. Hospital's revenues are placed in Tower Health's checking account. *Id.* at 6. For fiscal year 2018, Hospital had a net income surplus of $12,687,723, which was reinvested in furtherance of Hospital's mission. *Id.* For fiscal years 2019 and 2020, Hospital had deficits in net income of $34,116,689 and $75,684,171, respectively. *Id.* at 8.

The Montgomery County Board of Assessment Appeals (Board) granted Hospital's application for a property tax exemption as a nonprofit entity for tax years 2018 through 2021.[2] School District appealed to the trial court, which held a *de novo* trial. The trial court was troubled by the compensation of Tower Health's

---

[2] The Board filed a notice joining in Hospital's brief before this Court.

executives but nonetheless granted the property tax exemption, believing itself constrained by this Court's decision in *Phoebe Services, Inc. v. City of Allentown*, 262 A.3d 660, 670 (Pa. Cmwlth. 2021), *appeal denied*, 273 A.3d 509 (Pa. 2022). School District then appealed to this Court.

Before this Court, Patientrightsadvocate.org and Families USA filed a joint brief and Phoenixville Area School District filed a separate brief as *amici curiae* in support of the Board's denial of the property tax exemption. Hospital has filed an application for relief seeking to strike the briefs of the *amici* because they discuss matters not in the record. The application was listed for disposition with the merits.

## II. Issues

As an initial matter, Hospital contends that School District improperly filed a single notice of appeal. Although several tax exemption matters involving separate tracts were consolidated by the trial court, which issued a single decision, Hospital maintains that School District should have filed a separate notice of appeal for each case.

Hospital also filed an application for relief asking this Court to strike *amicus* briefs in support of School District, contending the briefs discuss extra-record information.

In its appeal,[3] School District raises several issues, which we summarize and reorder as follows.

---

[3] This Court has explained:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge

3

School District contends that for tax year 2018, Hospital had no standing to seek tax exemptions. Because Tower Health's purchase of the affected properties was not complete or certain at the time the applications for the tax exemptions were filed in 2017, School District maintains that Hospital had no ownership interest sufficient to confer standing to seek tax exempt status at that time.

School District also asserts that Tower Health, not Hospital, is the true party in interest. School District posits that Tower Health actually controls Hospital's day-to-day operations, including management and administration.

On the merits, School District maintains that the trial court erred in its conclusion that Hospital sustained its burden of demonstrating entitlement to tax exempt status under the various applicable legal tests.

---

must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

*Newman & Co. v. City of Phila.*, 249 A.3d 1240, 1244 n.5 (Pa. Cmwlth. 2021) (additional citations and quotation marks omitted). Specifically, in tax assessment appeals, the trial court is the finder of fact, and all matters of credibility and evidentiary weight are within its province; such findings are binding on appeal if they are supported by substantial evidence of record. *Lutheran Home v. Schuylkill Cnty. Bd. of Assessment Appeals*, 782 A.2d 1, 6 (Pa. Cmwlth. 2001) (first citing *Appeal of M.W. Kellogg Co.*, 492 A.2d 130 (Pa. Cmwlth. 1985); and then citing *St. Margaret Seneca Place v. Bd. of Prop. Assessment, Appeals & Rev.*, 640 A.2d 380 (Pa. 1994)).

4

## III. Discussion

### A. Single Notice of Appeal

This matter consists of three consolidated cases relating to three pieces of property Tower Health purchased – Hospital and two related buildings. School District filed a single notice of appeal. Its brief explains:

> On November 19, 2021, the Commonwealth Court issued an Order *Per Curiam* stating:
>
>> NOW, November 19, 2021, it appearing that Appellant filed a single notice of appeal seeking to appeal the October 8, 2021 Order of the Court of Common Pleas of Montgomery County, which disposed of three consolidated matters, the parties shall address the propriety of [School District's] filing of a single notice of appeal in their principal briefs on the merits or by other appropriate motion. *See Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018).
>
> In *Walker*, the Pennsylvania Supreme Court held that the Rules of Appellate Procedure require the filing of separate notices of appeal from all cases involved where one or more orders resolve issues arising on more than one docket or relating to more than one judgment.
>
> The tax appeal matters involving the three properties identified above were consolidated for discovery, filing and trial purposes under docket 2017-27756 . . . by a December 4, 2020 Agreed Order. ([Reproduced Record (RR) at] 224a-226a). That Order also directed the Montgomery County Prothonotary to close dockets 2017-27758 and 2017-27783 (involving the two outlying office buildings). *Id.* The [trial c]ourt's Memorandum and Order entered October 8, 2021 identified all three docket numbers in its caption, in the lead docket (2017-27756). *Id.*
>
> Counsel for [School] District prepared three Notices of Appeal, one in each case. ([RR at] 430a). When staff

5

attempted to file a Notice of Appeal Order in one of the closed dockets, the firm received an error message from the Montgomery County automated filing system that nothing could be filed in the case because it was closed. *Id.* In an effort to clarify the issue, the Prothonotary was called and asked how the Notice of Appeal could be filed in the closed dockets. *Id.* The Prothonotary's office instructed the staff member to file a Notice of Appeal in the open docket, using all three docket numbers in the case caption. ([RR at] 431a). The [f]irm then resubmitted the Notice of Appeal identifying all three actions based upon the instructions provided by the Prothonotary. (Notice of Appeal).

Of significance under these facts, following its decision in *Walker*, the Pennsylvania Supreme Court held that "filing a single notice of appeal from a single order entered at the lead docket number for consolidated civil matters where all record information necessary to adjudication of the appeal exists, and which involves identical parties, claims and issues, does not run afoul of *Walker*, Rule 341 [of the Pennsylvania Rules of Appellate Procedure] or its Official Note." *Always Busy Consulting, LLC v. Babford & Co*[.], 247 A.3d 1033, 1043 (Pa. 2021). That is precisely the case here. The three cases were consolidated for all purposes, and as can be seen from the Dockets, entries ceased in 2017-27758 and 2017-27783[.] [RR at] 11a and 15a.

Further, in *Township of Cranberry v. Spencer*, 249 A.3d 9 (Pa. [Cmwlth.] 2021), the Commonwealth Court appears to have acknowledged, that for matters that have been consolidated before the trial court, there is no requirement that appellant file individual notices of appeal. *See . . . Spencer*, 249 A.2d at 11 (noting in that at "under . . . *Walker* . . . , Spencer [the appellant] was required to file individual notices of appeal for each of the six cases, *as they had not been consolidated* before the trial court").

Accordingly, all three cases from the [c]ourt below are properly before this Court and should not be quashed or otherwise limited.

Sch. Dist.'s Br. at 60-62 (emphasis added).

6

School District's argument is well taken and correctly and cogently applies the relevant principles of law. We agree with School District that a single notice of appeal was sufficient in this case.

**B. Application to Strike *Amicus* Briefs**

Hospital filed an application for relief asking this Court to strike the brief of *amici* Patientrightsadvocate.org and Families USA and the brief of *amicus* Phoenixville Area School District on the basis that the briefs relied on matters that were outside the record or raised issues that were not preserved. This Court does not consider evidence outside the record. *See Tennyson v. Zoning Hearing Bd. of W. Bradford Twp.*, 952 A.2d 739 (Pa. Cmwlth. 2008) (stating that assertions outside of the record may not be considered on appeal). Further, we do not consider any legal arguments not preserved by the parties and *amici* may not assert such arguments. *See Stilp v. Commonwealth*, 905 A.2d 918, 928 n.14 (Pa. 2006) (noting that *amici* must take the issues as raised by the parties and cannot inject new issues that the parties have not preserved). Therefore, we have not considered any extra-record information or new arguments contained in briefs filed by the *amici*. Accordingly, we dismiss Hospital's application for relief as moot.

**C. Standing for Tax Year 2018**

School District argues that for tax year 2018, Hospital had no standing to seek a tax exemption, because Tower Health's purchase of the affected properties was not complete or certain at the time it filed applications on behalf of Hospital for the tax exemptions in 2017. *See* Sch. Dist.'s Br. at 58-60. School District contends

7

the trial court erred in concluding that Hospital had standing when it did not have legal title or possession of the properties at the time it applied for tax exempt status.

However, the asset purchase agreement was pending for several months before the deed transferring the properties was recorded in October 2017. *See* Trial Ct. Op. 12/21/21 at 5-7. The trial court specifically observed that the deed recorded in October 2017 "was not the result of an agreement a few days prior to the deed[;] rather it was a result of the Asset and Membership Interest Purchase Agreement dating back to May 30, 2017." *Id.* at 6.

The trial court explained that although Hospital was not the record owner of the properties when it applied for tax exempt status, it was the equitable owner pursuant to the pending asset purchase agreement and was therefore an aggrieved person. Trial Ct. Op. 12/21/21 at 6. The trial court posited that "the 'owner' of a property who may feel aggrieved [for tax assessment purposes] includes 'not only the registered owner of the real estate, but also an equitable owner or owner of a taxable interest in the property.'" *Id.* at 4 (quoting *W. Mifflin Area Sch. Dist. v. Bd. of Prop. Assessment, Appeals & Rev.*, 802 A.2d 687, 690 (Pa. Cmwlth. 2002)).

The trial court also reasoned that if Hospital was forced to wait until it had record ownership of the properties, the window for seeking a tax exemption for tax year 2018 would have passed, even though Hospital had legal title during that entire tax year.[4] Trial Ct. Op. 12/21/21 at 6; *see also* 53 Pa.C.S. § 8844(c) (providing that an aggrieved person may seek relief from a tax assessment on or before

---

[4] Moreover, it is logical that the conditional nature of a purchase agreement should neither defeat equitable ownership nor impede the prospective purchaser's ability to seek a tax exemption for the ensuing year. Depending on the amount at issue and the purchaser's financial circumstances, the purchaser may need to know whether a tax exemption is available before finalizing the purchase transaction, as the purchase might not be financially feasible if the exemption will not be available.

8

September 1 for the ensuing tax year). Thus, the trial court concluded that "it was appropriate for [Hospital] to apply for the 2018 tax exemption . . . before the 2017 deadline." Trial Ct. Op. 12/21/21 at 7. We agree with the trial court's reasoning and likewise conclude that Hospital had standing to seek a tax exemption prospectively for tax year 2018 while the purchase transaction was pending.

### D. Tower Health as the True Party in Interest

Citing *Appeal of Community General Hospital*, 708 A.2d 124 (Pa. Cmwlth. 1998), School District argues that the trial court erred in failing to find that Tower Health's degree of control over Hospital's operations made Tower Health the true party in interest that had to prove charitable status and entitlement to a tax exemption. Sch. Dist.'s Br. at 51-53. In *Community General*, this Court opined that

> control of a parent corporation over a corporate subsidiary is relevant in a charitable tax exemption case only where, under the analysis utilized when determining whether to pierce the corporate veil, the parent's level of control is so great that the subsidiary is merely a sham corporation or, in other words, the alter ego of the parent.

708 A.2d at 130.

School District suggests that Tower Health is the true party in interest under the reasoning of *Community General*. However, this argument ignores the critical fact that *Community General* involved a parent-subsidiary relationship. By contrast, Hospital is an LLC, of which Tower Health is the sole member. Accordingly, management responsibilities are as provided by Section 8847(a) and (b) of the Nonprofit Corporation Law of 1988[5]:

---

[5] 15 Pa.C.S. §§ 5101-6145.

9

(a) Determination of management of company.—*A[n LLC] is a member-managed [LLC] unless the operating agreement:*

> (1) *expressly provides that:*

>> (i) *the company is or will be manager-managed;*

>> (ii) the company is or will be managed by managers; or

>> (iii) management of the company is or will be vested in managers; *or*

> (2) *includes words of similar import.*

(b) Member-managed company.—In a member-managed [LLC], the following rules apply:

> (1) Except as expressly provided in this title, the management and conduct of the company are vested in the members.

> (2) Each member has equal rights in the management and conduct of the company's activities and affairs.

> (3) A difference arising among members as to a matter in the ordinary course of the activities and affairs of the company may be decided by a majority of the members.

> (4) Except as provided under section 325 (relating to approval by [LLC]) with respect to a transaction under Chapter 3 (relating to entity transactions), an act outside the ordinary course of the activities and affairs of the company may be undertaken only with the affirmative vote or consent of all members.

> (5) Except as provided under section 8822(d) (relating to amendment or restatement of certificate of organization), the certificate of organization may be amended only with the affirmative vote or consent of all members.

(6) The operating agreement may be amended only with the affirmative vote or consent of all members.

15 Pa.C.S. § 8847(a) & (b) (emphasis added).

Here, the operating agreement provides, in pertinent part:

The Company shall be managed by a Board of Trustees (the "Board"), subject to certain powers reserved to the Member. . . . Notwithstanding anything to the contrary in this Agreement, any power or duty not delegated to the Board pursuant to this Section 3.1 shall be reserved to the Member.

Operating Agreement, § 3.1, RR at 1255a-56a. Thus, it appears Hospital is a member managed LLC. School District cites no authority to support the proposition that a member's management of an LLC pursuant to statute would entitle an opposing party in litigation to pierce the corporate veil of the LLC solely by reason of such management.

Moreover, although it is true that Tower Health provides extensive management and administrative services to Hospital, it bills Hospital for those services, at least on paper. In addition, School District's brief fails to explain what, if any, difference in the outcome of this appeal would arise if Tower Health, a 501(c)(3) nonprofit entity, were deemed the real party in interest.

For these reasons, we reject School District's assertion of error in the trial court's failure to find Tower Health rather than Hospital to be the real party in interest.

11

## E. Entitlement to Real Estate Tax Exemption

## 1. General Legal Requirements for Tax Exemption

Pursuant to article VIII, section 2(a)(v) of the Pennsylvania Constitution, the General Assembly may by law exempt from taxation "[i]nstitutions of purely public charity . . . ." PA. CONST. art. VIII, § 2(a)(v). In order to implement article VIII, section 2(a)(v), the General Assembly enacted the Institutions of Purely Public Charity Act,[6] commonly known as Act 55. In order to qualify for an exemption as an institution of purely public charity, an entity must meet both the constitutional requirements set forth in *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985), known as the *HUP* test, and the statutory requirements of Act 55. *Mesivtah Eitz Chaim of Bobov, Inc. v. Pike Cnty. Bd. of Assessment Appeals*, 44 A.3d 3, 9 (Pa. 2012). The entity must also comply with any additional and not inconsistent requirements of the Consolidated County Assessment Law (CCAL).[7] *See* 53 Pa. C.S. § 8812(a)(3) & (c).

The party seeking a tax exemption has the burden of proving its entitlement to the exemption. *See* Section 236 of the Tax Reform Code of 1971,[8] 72 P.S. § 7236; *Fayette Res., Inc. v. Fayette Cnty. Bd. of Assessment Appeals*, 107 A.3d 839, 844-45 (Pa. Cmwlth. 2014).

---

[6] Act of November 26, 1997, P.L. 508, No. 55, 10 P.S. §§ 371-385.

[7] 53 Pa. C.S. §§ 8801-8868.

[8] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7101-10004.

## 2. The *HUP* Test

### a. Legal Requirements

In order to qualify for an exemption under any law enacted pursuant to article VIII, section 2, an entity must show that it is an institution of "purely public charity" by satisfying the five criteria of the *HUP* test; specifically, the entity must show that it:

> (a) Advances a charitable purpose;
>
> (b) Donates or renders gratuitously a substantial portion of its services;
>
> (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d) Relieves the government of some of its burden; and
>
> (e) Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317.

An institution advances a charitable purpose "if it benefits the public from an educational, religious, moral, physical or social standpoint." *City of Washington v. Bd. of Assessment Appeals*, 704 A.2d 120, 122-23 (Pa. 1997) (citing *HUP*, 487 A.2d at 1315). An institution can advance a charitable purpose even where it accepts payment from those who are able to pay or from Medicare or Medicaid. *See St. Margaret Seneca Place v. Bd. of Prop. Assessment, Appeals & Rev.*, 640 A.2d 380, 383 (Pa. 1994) (finding that accepting Medicaid payments was "perfectly consistent" with a nursing home's charitable purpose). Further, an institution relieves the government of some of its burden where "the institution bears a substantial burden that would otherwise fall to the government"; the institution need not "fully fund[] the care of some people who would otherwise be fully funded by the government." *Id.* at 384.

13

The final criterion of the *HUP* test, operating "entirely free from private profit motive," is a major issue in this appeal. In applying this criterion, "surplus revenue is not synonymous with private profit . . . ." *Guthrie Clinic, Ltd. v. Sullivan Cnty. Bd. of Assessment Appeals*, 898 A.2d 1194, 1199 n.6 (Pa. Cmwlth. 2006) (first citing *Wilson Area Sch. Dist. v. Easton Hosp.*, 747 A.2d 877, 880 (Pa. 2000); and then citing *St. Joseph Hosp. v. Berks Cnty. Bd. of Assessment Appeals*, 709 A.2d 928, 938 (Pa. Cmwlth. 1998)). Instead, the analysis focuses on how such revenue is used, specifically:

> 1) Whether the utilization of the revenue is made with the expectation of a reasonable return or some non-monetary benefit;
>
> 2) Whether the utilization of the revenue ultimately supports or furthers the eleemosynary nature of the charitable entity; and
>
> 3) Whether the utilization of the revenue inures, directly or indirectly, to any private individual related to the charitable entity or related organization(s).

*Wilson*, 747 A.2d at 880. Under the third of these factors, in determining whether revenue is used in furtherance of an institution's charitable purpose, courts consider the compensation of the institution's executives to determine whether it includes a "private or pecuniary return." *HUP*, 487 A.2d at 1312 (quoting *Episcopal Acad. v. Philadelphia*, 25 A. 55, 56 (Pa. 1892)). That analysis requires consideration of whether the amount of executive compensation is reasonable, and the extent, if any, to which it is based on the financial performance of the institution. *Compare, e.g.*, *Wilson*, 747 A.2d at 881 (upholding a tax exemption where hospital executives received reasonable salaries and no bonuses or fringe benefits), *with In re Dunwoody Vill.*, 52 A.3d 408, 423 (Pa. Cmwlth. 2012) (denying exemption where, *inter alia*,

14

"a substantial percentage" of executive compensation was based on the institution's financial or marketplace performance).

**b. Analysis**

The trial court concluded that Hospital met all five criteria of the *HUP* test. First, regarding a charitable purpose, the trial court found Hospital benefits the public from both an educational and a social standpoint. Trial Ct. Op. 10/8/21 at 28. Hospital provides education to its medical residents and the community at large and operates to prevent and treat disease and injury. *Id.* Hospital has an open admission policy and accepts patients regardless of their ability to pay. *Id.* at 27. Therefore, the trial court determined that since tax year 2018, Hospital has advanced a charitable purpose, and the fact that Hospital accepts payments from Medicare and Medicaid or from those patients who are able to pay did not require a different conclusion. *Id.*

Second, regarding provision of a "substantial" percentage of services gratuitously, the trial court again relied on Hospital's written financial assistance policy of providing medically necessary care without regard to patients' ability to pay. Trial Ct. Op. 10/8/21 at 28. The court found that Hospital donated or gratuitously rendered care in fiscal years 2018 through 2020 in the amounts of $15,607,753, $27,801,908, and $43,106,410, respectively, including costs for charity care, bad debt write-offs, and undercompensated care provided to patients on Medicare or Medicaid. *Id.* at 27-28. For fiscal years 2018-2020, Hospital's donations to the community exceeded its net income, and approximately 46-47% of patients paid less than the full cost of their care. *Id.* at 28. Therefore, the trial court concluded that "[u]nder the totality of the circumstances, Hospital has made a 'bona

15

fide effort to service primarily those who cannot afford the usual fee,'" and consequently, Hospital donated or rendered gratuitously a substantial portion of its services. *Id.* at 29.

Third, regarding benefits to persons who are legitimate objects of charity, the trial court once again pointed to Hospital's open admission policy. Trial Ct. Op. 10/8/21 at 30. Further, the court observed that "people whose costs are only partially covered by Medicaid payments are manifestly legitimate objects of charity and people who cannot afford to pay." *Id.* at 29 (quoting *St. Margaret Seneca Place*, 640 A.2d at 384) (additional quotation marks omitted).

Fourth, regarding relief of some of the government's burden, the trial court found that Hospital regularly accepts Medicare and Medicaid payments that are less than the costs of services rendered to the covered patients. Trial Ct. Op. 10/8/21 at 30. The court reasoned that without Hospital, the government would have to fund the full costs of such services. *Id.* Therefore, the trial court concluded that Hospital's acceptance of less than full payment relieves the government of some financial burden. *Id.*

Fifth, regarding operations free from private profit motive, the trial court found Hospital's surplus revenue in 2018 was reinvested into Hospital to improve services. Trial Ct. Op. 10/8/21 at 31. There were deficits in 2019 and 2020. In all three fiscal years, Hospital's uncompensated services exceeded its net income. *Id.*

Regarding executive compensation, the trial court found that such compensation paid by Tower Health, as well as Hospital, was relevant to this factor of the *HUP* test. Trial Ct. Op. 10/8/21 at 32. The trial court described the high compensation of Tower Health's executives as "eye popping," but nevertheless

16

determined it was reasonable because the trial court concluded it was bound by this Court's decision in *Phoebe Services*. Trial Ct. Op. 2/3/22 at 24-26.

In *Phoebe Services*, we concluded the *HUP* test was not violated where an "incentive pay plan [was] typical of other healthcare nonprofits, represent[ed] fair market value for the services provided, and [was] not directly tied to the financial status of the nonprofit" and "[t]he compensation scheme [was] designed to stay competitive within the market, and retain employees rather than lose the employees to competitors . . . ." Slip op. at 18-19. This Court reached that conclusion even though the base salaries of some executives were between the 75th and 90th percentile of market salary levels and the bonus and incentive pay for the chief executive officer (CEO) could exceed 25% of base compensation. *Id.* at 18.

Relying on *Phoebe Services*, the trial court here concluded executive compensation of both Hospital and Tower Health met the *HUP* test because salaries did not exceed the 90th percentile. Trial Ct. Op. 10/8/21 at 22 & 25-26. The trial court reached this conclusion even though 40% of incentive pay was based on financial performance. *See id.* at 13.

Concluding that all factors were met, the trial court determined that Hospital met the *HUP* test requirement to operate entirely free from private profit motive. Trial Ct. Op. 10/8/21 at 33. Accordingly, the trial court concluded Hospital met the constitutional requirements for a tax exemption as a "purely public charity." *Id.*

Despite the trial court's careful analysis, we disagree with its conclusion. The trial court made clear that it would have rejected Hospital's argument regarding the reasonableness of the executive salaries if it had not been

17

constrained by this Court's analysis in *Phoebe Services*. However, we do not find *Phoebe Services* applicable or persuasive in this case.

In *Dunwoody Village*, this Court explained that the requirements of the *HUP* test are separate from those of Act 55. 52 A.3d at 422 (explaining that "an entity seeking a tax exemption as an institution of purely public charity must first meet the constitutional requirements of the *HUP* test before the question of whether it satisfies the corresponding statutory criteria in act 55 can be addressed") (citing *Mesivtah Eitz Chaim*)). For example, Act 55 requires an applicant for a tax exemption to demonstrate, in part, that employee compensation "is not based primarily upon the financial performance of the institution." *Dunwoody Vill.*, 52 A.3d at 421 (quoting Section 5(c)(3) of Act 55, 10 P.S. § 375(c)(3)) (additional quotation marks omitted). However, the *HUP* test, which must be satisfied first, may preclude a tax exemption even though less than the majority of an employee's compensation is based on the institution's financial performance. *Dunwoody Vill.*, 52 A.3d at 422.

The executive compensation at issue in *Dunwoody Village* "included incentives related to [the institution's] financial or marketplace performance," such that compensation was based "in part" on the institution's annual financial performance. 52 A.3d at 422-23. This Court observed that the CEO's maximum incentive bonus was 24% of salary and the chief financial officer's was 18-19%. *Id.* at 423. We described this as "a substantial percentage" of compensation that was based on financial performance. *Id.* Notably, there was no discussion in *Dunwoody Village* stating how much of the bonus incentive was tied to financial performance rather than other criteria. *See id.* Nonetheless, we affirmed the lower court's

18

decision that the institutional taxpayer "failed to establish that it operate[d] entirely free from private profit motive." *Id.* (additional citation omitted).

*Phoebe Services* concerned an application for an exemption from a business privilege tax imposed by a city ordinance. At issue was whether the nonprofit taxpayer was a "business" within the meaning of the ordinance, which defined that term as "any activity carried on or exercised for gain or profit in the [c]ity." 262 A.3d at 663. The city argued that the taxpayer operated with a profit motive because its executive compensation included bonuses based on financial performance. *Id.* at 666. This Court found cases analyzing the *HUP* test's "private profit motive" criterion, including *Dunwoody Village*, to be instructive. *Id.* at 669. Contrary to the city's argument, however, we found that the executive compensation in *Phoebe Services* was "not directly tied to the financial status of the nonprofit." *Id* at 671. Thus, *Phoebe Services* is distinguishable from *Dunwoody Village* in this regard.

Accordingly, we find *Dunwoody Village* more analogous and persuasive than *Phoebe Services* in this case. We do not accept the suggestion that the executive salaries at issue must be deemed reasonable merely because they do not exceed the 90th percentile for such salaries.[9] We agree with the trial court's characterization of the Tower Health executive salaries at issue as "eye popping,"[10]

---

[9] We also note that when Tower Health's executive committee was informed in 2019 that executive salaries for 2018 were above the 90th percentile, the committee authorized its salary consultant to create a new custom nationwide peer group for salary comparison rather than comparing only east coast salaries. RR at 2441a-42a.

[10] For example, in 2017, Tower Health's CEO received a salary of $1,012,788 and a bonus of $425,000. RR at 2347a. For 2018, after the asset purchase, he received a base salary of $1,149,500, and in December 2018, Tower Health's executive compensation committee approved payments of a fiscal year 2018 incentive for its CEO of $547,428 and an annualized retention

19

and we also conclude that tying 40% of the bonus incentives to Hospital's financial performance is sufficiently substantial to indicate a private profit motive,[11] contrary to the *HUP* test.

In addition, in its analysis regarding net income, the trial court did not acknowledge or consider any evidence regarding the reasonableness of the charges imposed by Tower Health for the management and administrative services it provided to Hospital. Significantly, those fees grew exponentially from year to year. For fiscal year 2018, Hospital was charged fees of $4,446,862. RR at 1367a. For fiscal year 2019, Hospital was charged fees of $10,933,807. *Id.* at 1368a. For fiscal year 2020, Hospital was charged fees of $23,167,740. *Id.* at 1369a. Nonetheless, at

award of 20% of base salary per year for fiscal years 2019-2023, subject to vesting. RR at 2399a & 2425a. In March 2019, the committee approved an additional $30,000 added to the 2018 incentive, for a total incentive of $577,428. RR at 2439a. By fiscal year 2020, Tower Health's CEO was receiving a base salary of $1,400,000, plus incentive and his 20% retention award. *See* RR at 2449a.

Notably, while Tower Health's executive salaries were increasing dramatically, the salaries of Hospital's executives were not only far lower, but were actually decreasing. Hospital's CEO received total compensation of $542,058 for fiscal year 2018, including a $75,132 annual incentive award, and $494,162 for fiscal year 2019, including a $25,196 annual incentive award; other Hospital executives likewise received lower levels of compensation in 2019. Trial Ct. Op. 2/23/22 at 9. Similar discrepancies appear in the salaries in related cases in the Chester County Court of Common Pleas, which contributed to that court's conclusion that

> [the CEO] and the Board of Tower Health were no more tha[n] corporate health care raiders . . . . The goal as evident from the financial documentation offered at trial was simple and direct – drain the juice out of the hospitals until there was nothing left but a dried-out husk and then leave, close the doors, or sell what was left.

*Brandywine Hosp., LLC v. Cnty. of Chester Bd. of Assessment Appeals*, ___ A.3d ___, ___ (Pa. Cmwlth., Nos. 1279, 1280, 1283 & 1284 C.D. 2021, filed Feb. 10, 2023), slip op. at 17 (quoting Chester County Court of Common Pleas) (quotation marks omitted).

[11] We also note that during negotiations with Tower Health's CEO, its negotiator expressly suggested "that the best way to optimize his income is by getting great results for [Tower Health] and maxing out the bonus opportunity." RR at 2402a.

trial, a Hospital witness testified that Hospital never studied the charges to determine whether the administrative and management fees charged by Tower Health were fair or reasonable for the services provided. RR at 445a.

Without evidence to establish the reasonableness of the fees it paid to Tower Health, Hospital could not satisfy its burden of showing that it operated entirely free from a profit motive under the *HUP* test. For this additional reason, we conclude that Hospital did not demonstrate compliance with the requirements of the *HUP* test.

Because we conclude that Hospital has not met the *HUP* test, we reverse the trial court's decision. Accordingly, analysis of the Act 55 and CCAL factors is not necessary, as Hospital must satisfy *all three* tests to qualify for tax exempt status. *See* 53 Pa. C.S. § 8812(a)(3) & (c); *Mesivtah Eitz Chaim*, 44 A.3d at 9.[12]

## IV. Conclusion

Based on the foregoing analysis, we reverse the trial court's order granting tax exempt status and hold that Hospital is not entitled to a real property tax

---

[12] Nonetheless, we note our agreement with the trial court's conclusion that Hospital did not fully meet all criteria of the CCAL, 53 Pa.C.S. § 8812(a)(3)(ii) (stating that "[t]he property of purely public charities is necessary to and actually used for the principal purposes of the institution and not used in such a manner as to compete with commercial enterprise"), regarding two of the three properties for which Hospital sought tax exemptions. The trial court found that only 66% of another building that Tower Health bought along with Hospital was used for Hospital's principal purposes; therefore, only 66% of that property was deemed tax exempt. Trial Ct. Op. 10/8/21 at 2 & 37-38. A third property was sold by Tower Health in 2020; therefore, the trial court observed that no tax exemption for that property would be available for 2021. *Id.* at 2 & 38. Neither Hospital nor Tower Health challenges those limitations on Hospital's tax-exempt status.

21

exemption for the 2018 to 2021 tax years.  We dismiss as moot Hospital's application for relief seeking to strike the briefs filed by *amici* in support of School District.

 

_____

CHRISTINE FIZZANO CANNON, Judge

Judge Wallace did not participate in the decision in this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pottstown School District,
    Appellant      :
              :
              :
    v.        :
              :
Montgomery County Board of   :
Assessment Appeals, Pottstown  :
Hospital, LLC, Pottstown Borough  :  No. 1217 C.D. 2021
and County of Montgomery    :

O R D E R

    AND NOW, this 10th day of February, 2023, the October 8, 2021 order of the Court of Common Pleas of Montgomery County is REVERSED. The application for relief seeking to strike briefs filed by *amici curiae* in support of Pottstown School District is DISMISSED AS MOOT.

             _____
             CHRISTINE FIZZANO CANNON, Judge