IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jennersville Hospital, LLC, | : | CASES CONSOLIDATED |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| County of Chester Board of | : | |
| Assessment Appeals, Avon Grove | : | Nos. 1282 & 1286 C.D. 2021 |
| School District and Penn Township | : | Argued: November 16, 2022 |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON          FILED:  February 10, 2023

        Jennersville Hospital, LLC (Hospital), appeals from a decision of the Court of Common Pleas of Chester County (trial court). After thorough review, we agree with the County of Chester Board of Assessment Appeals (Board) that Hospital has waived all issues on appeal. Accordingly, we dismiss the appeals.

        We dismiss as moot Hospital's applications for relief seeking to strike the briefs filed by Patientrightsadvocate.org and Families USA as *amici curiae* in support of the Board.

# I. Background

In 2017, Reading Health System, now known as Tower Health, LLC (Tower Health), bought several for-profit hospital facilities and related properties formerly owned by Community Health Systems (CHS), a for-profit entity, in Montgomery and Chester Counties. Trial Ct. Op. at 11-12. Tower Health, a limited liability company (LLC) with federal nonprofit status under 26 U.S.C. § 501(c)(3), created a new LLC to run each of the purchased hospital facilities as a nonprofit entity. *Id.* at 11. Tower Health is the sole member of each new LLC. *Id.* at 11 & 13. Hospital is one of the new LLCs and operates a hospital facility in Chester County. *Id.* at 12-13.

The Board denied Hospital's application for a property tax exemption for tax years 2018 through 2021. Hospital appealed to the trial court, which held a *de novo* trial. The trial court also denied the property tax exemption, finding that Hospital failed to sustain its burden of proving entitlement to a tax exemption as a nonprofit entity.

Hospital then appealed to this Court. In response to the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure (1925(b) Statement), Pa. R.A.P. 1925(b), Hospital filed a 19-page 1925(b) Statement containing some 88 issues and sub-issues. Application to Dismiss, Ex. A. In its subsequent opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure (1925(a) Opinion), Pa. R.A.P. 1925(a), the trial court stated that Hospital's 1925(b) Statement failed to comply with the rule's conciseness requirement and hindered the trial court in preparing its 1925(a) Opinion. 1925(a) Op. at 3.

In Hospital's appeals before this Court, Patientrightsadvocate.org and Families USA filed joint briefs as *amici curiae* in support of the Board's denial of the property tax exemption. Hospital has filed applications for relief seeking to strike the briefs of the *amici* because they discuss matters not in the record.

## II. Issues

Hospital raises six issues in its brief on appeal, which we combine into three issues. First, Hospital asserts that it had standing to apply for a real estate tax exemption for tax year 2018 even though, at the time the application was filed in 2017, Hospital was not the legal owner of the property at issue. Second, Hospital contends that the trial court improperly considered expert testimony asserting legal conclusions and that those conclusions were contrary to law. Third, and primarily, Hospital maintains that it met all of the factual and legal requirements for a property tax exemption. In addition, Hospital argues that this Court should grant Hospital's application for relief and strike the briefs filed by the *amici* because the briefs improperly contained information not in the record before this Court and presented arguments not raised by the parties.

The Board opposes each of Hospital's arguments. Further, the Board has filed an application for relief seeking dismissal of this appeal. The Board posits that Hospital waived all of its issues on appeal because it filed a 1925(b) Statement that failed to comply with the rule's conciseness requirement.

We have reordered our discussion of the issues for convenience and clarity.

# III. Discussion[1]

## A. Standing for Tax Year 2018

The Board argues that for tax year 2018, Hospital had no standing to seek a tax exemption because Tower Health's purchase of the affected properties was not complete or certain at the time it filed its applications for the tax exemptions in 2017. However, the asset purchase agreement was pending for several months before the deed transferring the properties was recorded in October 2017. *See* Trial Ct. Op. at 21 & 23-24; Reproduced Record (RR) at 283a, 2022a, 2057a, 2059a & 2072a; Hospital's Br. at 5-6. Moreover, the purchase transaction was complete before the Board's hearing on Hospital's application for a property tax exemption. *See* RR at 2072a (reciting that transaction closed on October 1, 2017), 595a & 601a (Board decisions reciting that Board hearings were held on October 19, 2017 and September 12, 2018). Had the application for tax exempt status been delayed until

---

[1] As this Court has stated:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

*Newman & Co. v. City of Phila.*, 249 A.3d 1240, 1244 n.5 (Pa. Cmwlth. 2021) (additional citations and quotation marks omitted). Specifically, in tax assessment appeals, the trial court is the finder of fact, and all matters of credibility and evidentiary weight are within its province; such findings are binding on appeal if they are supported by substantial evidence of record. *Lutheran Home v. Schuylkill Cnty. Bd. of Assessment Appeals*, 782 A.2d 1, 6 (Pa. Cmwlth. 2001) (first citing *Appeal of M.W. Kellogg Co.*, 492 A.2d 130 (Pa. Cmwlth. 1985); and then citing *St. Margaret Seneca Place v. Bd. of Prop. Assessment, Appeals & Rev.*, 640 A.2d 380 (Pa. 1994)).

the purchase transaction was complete and the deed recorded, the 2017 filing window for 2018 tax exempt status, which was May 1 to August 1, *see* RR at 581a-82a & 585a, would have expired. Therefore, as the equitable owner of the property, Hospital maintains it was an aggrieved party entitled to apply for a tax exemption, in accordance with Section 8844(c)(1) & (2) of the Consolidated County Assessment Law (CCAL),[2] 53 Pa.C.S. § 8844(c)(1) & (2) (relating to annual appeal deadlines).

The trial court opined that Hospital lacked standing to apply for a 2018 tax exemption because neither Tower Health nor Hospital was the record owner of the property at issue at the time the application was filed. The trial court acknowledged that equitable ownership would be sufficient to confer standing. Trial Ct. Op. at 21 & 23-24. However, the trial court deemed the purchase agreement insufficiently certain to confer equitable ownership status. *Id.* at 23-24. The trial court pointed to the conditional and complex nature of the purchase agreement and the number of conditions, including a $590 million bond issue, that had to be satisfied for the purchase of the multiple properties involved in Tower Health's purchase transaction, which included properties in both Montgomery and Chester Counties. *Id.* at 12 & 23-24. The trial court also observed that settlement for the transaction did not occur until October 2017, after several continuances. *Id.* at 24.

However, the trial court did not cite any authority to support its determination that the contingent nature of the purchase transaction deprived Hospital of standing in 2017 to pursue a tax exemption for the 2018 tax year. *See* Trial Ct. Op. at 21 & 23-24. We are likewise unaware of any such authority.[3]

---

[2] 53 Pa.C.S. §§ 8801-8868.

[3] Moreover, it is logical that the conditional nature of a purchase agreement should neither defeat equitable ownership nor impede the prospective purchaser's ability to seek a tax exemption

5

Accordingly, we agree with Hospital that it had standing to seek a tax exemption prospectively for tax year 2018 while Tower Health's purchase transaction was pending.

## B. Waiver of Issues on Appeal

Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure requires a trial court, upon receipt of a notice of appeal from its decision, to provide a written opinion explaining the reasons for its decision. Pa. R.A.P. 1925(a). Rule 1925(b)(4) provides, in pertinent part:

> (b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court.—
> If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("[1925(b)] Statement").
>
> . . . .
>
> (4) Requirements; waiver.
>
>> (i) The [1925(b)] Statement shall set forth only those errors that the appellant intends to assert.
>>
>> (ii) The [1925(b)] Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge . . . .
>>
>> . . . .

for the ensuing year. Depending on the amount at issue and the purchaser's financial circumstances, the purchaser may need to know whether a tax exemption is available before finalizing the purchase transaction, as the purchase might not be financially feasible if the exemption will not be available.

(iv) The [1925(b)] Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver.

(v) Each error identified in the [1925(b)] Statement will be deemed to include every subsidiary issue that was raised in the trial court . . . .

Pa. R.A.P. 1925(b)(4).

Here, the trial court ordered Hospital to file a 1925(b) Statement. Hospital filed a 1925(b) Statement that was 19 pages long with 43 numbered issues and 46 sub-issues in paragraph 43, for a total of 88 issues and sub-issues. Application to Dismiss, Ex. A. In its Rule 1925(a) Opinion, the trial court posited that Hospital violated Rule 1925(b)'s conciseness requirement. 1925(a) Op. at 3. Notably, the trial court expressly declared that the 1925(b) Statement's lack of conciseness hampered its issuance of the 1925(a) Opinion. *Id.*

Consistent with the trial court's Rule 1925(a) Opinion, the Board filed an application for relief in the form of a motion to dismiss the appeal. The Board argues that Hospital's failure to comply with Rule 1925(b) waived all issues. We agree.

In *Eiser v. Brown & Williamson Tobacco Corp.*, a plurality of our Supreme Court opined that the number of issues in a 1925(b) statement should not, standing alone, result in waiver. 938 A.2d 417, 427 n.16 (Pa. 2007). The current Rule 1925(b)(4)(iv) reflects that principle. *See* Pa. R.A.P. 1925(b)(4)(iv).[4] In

[4] "The [1925(b)] Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise

7

determining whether waiver is appropriate, a court should consider whether the circumstances indicate a lack of good faith by the appellant. *Eiser*, 938 A.2d at 427 n.16. However, lack of good faith may be inferred from the degree of noncompliance with Rule 1925(b), including lack of conciseness; a 1925(b) statement must not be "so lengthy that it does not meet the goal of narrowing down the issues previously raised to the few that are likely to be presented to the appellate court without giving the trial judge volumes to plow through." *Commonwealth v. Reeves*, 907 A.2d 1, 2-3 (Pa. Super. 2006); *see also Jones v. Jones*, 878 A.2d 86, 89-90 (Pa. Super. 2005) (7-page statement listing 29 issues in narrative form showed lack of good faith effort to comply with Rule 1925(b); "such 'voluminous' statements do not identify the issues that [a]ppellant actually intends to raise on appeal because the briefing limitations contained in [Pennsylvania Rule of Appellate Procedure] 2116(a)[ ] make[] the raising of so many issues impossible"); *Kanter v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004) (raising an "outrageous" number of issues in a 1925(b) statement "deliberately circumvent[s] the meaning and purpose of Rule 1925(b) and . . . effectively preclude[s] appellate review . . ."); *Mundy v. Bureau of Admin. Adjudication* (Pa. Cmwlth., No. 1984 C.D. 2012, filed Apr. 5, 2013)[5] (first citing *Eiser*; then citing *Jones*; and then citing *Reeves*).

Here, our review of Hospital's 1925(b) Statement reveals a significant number of issues that are redundant and/or not concise. Issues and sub-issues are set forth and discussed in a level of detail more appropriate to a brief than a statement

manner, the number of errors raised will not alone be grounds for finding waiver." Pa. R.A.P. 1925(b)(4)(iv).

[5] We cite this unreported opinion as persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a).

of issues, in violation of Rule 1925(b)(4)(iv). As a result, many issues that should constitute single short paragraphs are needlessly expanded, broken out into parts, and distributed into numerous paragraphs or subparagraphs. Hospital has also thereby ignored Rule 1925(b)(4)(v)'s admonition that error statements are deemed to include all subsidiary issues properly raised in the trial court. Although the number of issues alone generally does not trigger waiver, that principle applies only where the stated issues are concise and not redundant. *See* Pa. R.A.P. 1925(b)(4)(iv). That is not the case here. Rather, Hospital forced the trial court to "plow through" a mass of issues that the trial court expressly stated created an impediment to its consideration of the issues and preparation of the 1925(a) Opinion.[6] 1925(a) Op. at 3; *see Reeves*, 907 A.2d at 2-3.

Significantly, in its docketing statement, Hospital was able to keep its statement of issues to 2 pages with 11 issues. Its appellate brief ultimately raised only six issues, which this Court consolidated to three issues for discussion. Thus, there was neither need nor justification for a 1925(b) Statement that listed nearly 8 times more issues than the docketing statement, nearly 15 times more issues than the statement of questions in Hospital's brief, and nearly 30 times the number of actual issues discerned by this Court.

This case is analogous to others where waiver has been found. *See, e.g.*, *King v. Riverwatch Condo. Owners Ass'n* (Pa. Cmwlth., No. 881 C.D. 2014, filed Apr. 24, 2015), slip op. at n.6 (finding waiver where 1925(b) statement of errors

---

[6] At oral argument, Hospital's counsel indicated that the 1925(b) Statement was initially made lengthy to ensure that nothing was missed, and was then pared down later for briefing. This kitchen-sink approach to the 1925(b) Statement is contrary to the very purpose of Rule 1925(b), which is intended to *narrow* the issues the trial court must review and address in its 1925(a) Opinion. *See Commonwealth v. Reeves*, 907 A.2d 1, 2-3 (Pa. Super. 2006).

9

was 18 pages long and contained 51 paragraphs); *Tucker v. R.M. Tours*, 939 A.2d 343 (Pa. Super. 2007), *aff'd*, 977 A.2d 1170 (Pa. 2009) (finding waiver where 1925(b) statement of errors was 16 pages long and contained 76 paragraphs plus exhibits). Indeed, this Court is unaware of any similarly egregious instance where waiver was not found.

For these reasons, we conclude that Hospital has waived all of its issues on appeal for failure to comply with Rule 1925(b). Nevertheless, we address Hospital's appellate issues for completeness, and note that, even if Hospital had not waived all issues on appeal, we would affirm the trial court's decision on the merits.

## C. Entitlement to Real Estate Tax Exemption

### 1. General Legal Requirements for Tax Exemption

Pursuant to article VIII, section 2(a)(v) of the Pennsylvania Constitution, the General Assembly may by law exempt from taxation "[i]nstitutions of purely public charity . . . ." PA. CONST. art. VIII, § 2(a)(v). In order to implement article VIII, section 2(a)(v), the General Assembly enacted the Institutions of Purely Public Charity Act,[7] commonly known as Act 55. In order to qualify for an exemption as an institution of purely public charity, an entity must meet both the constitutional requirements set forth in *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985), known as the *HUP* test, and the statutory requirements of Act 55. *See Mesivtah Eitz Chaim of Bobov, Inc. v. Pike Cnty. Bd. of Assessment Appeals*, 44 A.3d 3, 9 (Pa. 2012). The entity must also comply with any additional and not inconsistent requirements of the CCAL. *See* 53 Pa.C.S. § 8812(a)(3) & (c).

_____

[7] Act of November 26, 1997, P.L. 508, No. 55, 10 P.S. §§ 371-385.

10

The party seeking a tax exemption has the burden of proving its entitlement to the exemption. *See* Section 236 of the Tax Reform Code of 1971,[8] 72 P.S. § 7236; *Fayette Res., Inc. v. Fayette Cnty. Bd. of Assessment Appeals*, 107 A.3d 839, 844-45 (Pa. Cmwlth. 2014).

## 2. The *HUP* Test
### a. Legal Requirements

In order to qualify for an exemption under any law enacted pursuant to article VIII, section 2, an entity must show that it is an institution of "purely public charity" by satisfying the five criteria of the *HUP* test; specifically, the entity must show that it:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317.

An institution advances a charitable purpose "if it benefits the public from an educational, religious, moral, physical or social standpoint." *City of Washington v. Bd. of Assessment Appeals*, 704 A.2d 120, 122-23 (Pa. 1997) (citing *HUP*, 487 A.2d at 1315). An institution can advance a charitable purpose even where it accepts payment from those who are able to pay or from Medicare or

---

[8] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7101-10004.

Medicaid. *See St. Margaret Seneca Place v. Bd. of Prop. Assessment, Appeals & Rev.*, 640 A.2d 380, 383 (Pa. 1994) (finding that accepting Medicaid payments was "perfectly consistent" with a nursing home's charitable purpose). Further, an institution relieves the government of some of its burden where "the institution bears a substantial burden that would otherwise fall to the government"; the institution need not "fully fund[] the care of some people who would otherwise be fully funded by the government." *Id.* at 384.

The final criterion of the *HUP* test, operating "entirely free from private profit motive," is a major issue in this appeal. In applying this criterion, "surplus revenue is not synonymous with private profit . . . ." *Guthrie Clinic, Ltd. v. Sullivan Cnty. Bd. of Assessment Appeals*, 898 A.2d 1194, 1199 n.6 (Pa. Cmwlth. 2006) (first citing *Wilson Area Sch. Dist. v. Easton Hosp.*, 747 A.2d 877, 880 (Pa. 2000); and then citing *St. Joseph Hosp. v. Berks Cnty. Bd. of Assessment Appeals*, 709 A.2d 928, 938 (Pa. Cmwlth. 1998)). Instead, the analysis focuses on how such revenue is used, specifically:

> 1) Whether the utilization of the revenue is made with the expectation of a reasonable return or some non-monetary benefit;
>
> 2) Whether the utilization of the revenue ultimately supports or furthers the eleemosynary nature of the charitable entity; and
>
> 3) Whether the utilization of the revenue inures, directly or indirectly, to any private individual related to the charitable entity or related organization(s).

*Wilson*, 747 A.2d at 880. Under the third of these factors, in determining whether revenue is used in furtherance of an institution's charitable purpose, courts consider the compensation of the institution's executives to determine whether it includes a

"private or pecuniary return." *HUP*, 487 A.2d at 1312 (quoting *Episcopal Acad. v. Phila.*, 25 A. 55, 56 (Pa. 1892)). That analysis requires consideration of whether the amount of executive compensation is reasonable, and the extent, if any, to which it is based on the financial performance of the institution. *Compare, e.g.*, *Wilson*, 747 A.2d at 881 (upholding a tax exemption where hospital executives received reasonable salaries and no bonuses or fringe benefits), *with In re Dunwoody Vill.*, 52 A.3d 408, 423 (Pa. Cmwlth. 2012) (denying exemption where, *inter alia*, "a substantial percentage" of executive compensation was based on the institution's financial or marketplace performance).

### b. Analysis

Although the evidence described above can be construed as relating to all of the *HUP* test's criteria, the trial court posited that Hospital "chose to address only whether it met the charitable purpose test" based on "the very fact that it is an acute care hospital with an open admission policy . . . ." Trial Ct. Op. at 28. The trial court concluded that the "evidence fails to speak to whether [Hospital] meets all the criteria set forth in the variety of tests that govern exemption from real estate taxation." *Id.* at 29. Nonetheless, the trial court went on to acknowledge and discuss Hospital's arguments under some other factors of the *HUP* test.

### i. Profit Motive

As this Court has explained, "the diversion of surplus monies into other entities that have a profit motive is evidence of a profit motive." *Phoebe Servs., Inc. v. City of Allentown*, 262 A.3d 660, 670 (Pa. Cmwlth. 2021), *appeal denied*, 273 A.3d 509 (Pa. 2022). Here, the trial court found the record did not support the

13

reasonableness of the management fees and bond interest charges. Thus, the trial court inferred a profit motive in the payment and collection of unsupported fees and charges.

The trial court found that Tower Health generates income solely through charges it imposes on various LLCs, including Hospital, in the form of management fees, central business office fees, and bond issue interest payment obligations. Trial Ct. Op. at 13. In the trial court's view, Tower Health drew money from the hospitals without sufficient explanation and "at an alarming rate." *Id.* (citing RR at 882a-84a). The trial court observed that Tower Health charged Hospital $1,080,000 in management fees for 2018, an amount that increased to $3,094,200 in 2019 and $6,101,534 in 2020. *Id.* The trial court found no evidence was presented to support the reasonableness of these "ever-increasing" management fees. *Id.* at 14.

The trial court found that Tower Health improperly charged exorbitant fees to all of the hospital LLCs and applied hospital funds for purposes other than support of the specific hospital. Trial Ct. Op. at 38. Hospital did not scrutinize whether the fees were reasonable for the services provided by Tower Health. *See, e.g.*, RR at 74a-75a, 206a & 339a (testimony by Hospital's chief executive officer (CEO), Tower Health's Senior Vice President of Financial Operations, and Hospital's chief financial officer that Hospital did not negotiate over Tower Health's management and administrative fees and did not analyze whether the fees imposed by Tower Health were reasonable); Trial Ct. Op. at 36 (observing that "[n]o one questioned" the Tower Health executive salaries or why the management fees were

14

so high).[9] Further, the trial court found that "Tower Health presented no justification for taking such large sums as a management fee . . . ." Trial Ct. Op. at 27; *see also* RR at 173a (testimony by Tower Health's President of Financial Operations that Tower Health did not study whether hospitals were receiving value for the fees charged to them).

The trial court also found the use of interest payments on the bonds for acquisition of properties other than the hospitals at issue was improper and that "[n]ot one penny from the bonds were [sic] applied to support and to increase the efficiency and facilities of each hospital." Trial Ct. Op. at 38-39. The trial court explained that the purchase transaction to acquire the various hospitals involved in Tower Health's asset purchase was funded by a $590 million bond issue that served as both purchase funds and operating capital. *Id.* at 12. Although the individual LLCs did not receive any of the bond issue proceeds directly, they are all part of an "obligated group," members of which pledged their assets as collateral for the bond issue and pay proportional shares of the interest on the bonds. *Id.*

Moreover, as discussed below, the trial court observed that the federal excise tax charged to Tower Health because of its excessive executive compensation was then assessed by Tower Health against the hospital LLCs; the trial court concluded "the payments from each hospital to Tower [Health] clearly was [sic] not

---

[9] Notwithstanding this evidence and the trial court's finding, we note that Tower Health's Senior Vice President of Financial Operations testified that "[t]he hospitals all think that their [m]anagement [f]ees are excessive" and "question them all the time"; however, Tower Health has never adjusted any fee in response to questions from hospitals. RR at 217a-19a.

then applied to the hospitals' benefit, but rather to their detriment." Trial Ct. Op. at 39.[10]

We find no error in the trial court's reasoning. Therefore, we agree with the trial court that Hospital failed to sustain its burden of demonstrating the absence of a profit motive behind its management fees and bond interest payments.

Diversion of money to employees through excessive salaries and fringe benefits may also evidence a private profit motive. *Phoebe Servs.*, 262 A.3d at 670 (first citing *St. Margaret*, 640 A.2d at 385; and then citing *Dunwoody Vill.*, 52 A.3d at 422-23). Notably, tying executive compensation to the entity's financial performance is indicative of a profit motive. *See Phoebe Servs.*, 262 A.3d at 670 (citing *Dunwoody Vill.*, 52 A.3d at 423).

Here, the trial court pointed to substantial salary increases paid to Tower Health executives, purportedly connected to their work in support of the 2017 multi-property purchase transaction. Trial Ct. Op. at 14. However, the trial court found Tower Health's executives did nothing other than foster the purchase transaction, and there was no evidence that the executives' services helped any individual hospital provide its services. *Id.* Further, the trial court observed that Tower Health was subject to a federal excise tax as a nonprofit entity paying its executives more than $1,000,000 per year. *Id.* at 16. The trial court intimated that imposition of the excise tax, which Tower Health passed on to Hospital and the other new LLCs, was an indicator of unreasonably high executive salaries. *See id.* at 27-28.

---

[10] The trial court did not cite to the record for its findings, and Hospital challenges many of them as not supported by the record. However, the trial court's decision is supported more by the evidence it found absent than the purported evidence it referenced.

16

The trial court also found that Tower Health's executive compensation bonus incentives were weighted 70% on financial performance and 30% on patient care and patient satisfaction. Trial Ct. Op. at 15. Although Hospital asserts this figure is without evidentiary support, Hospital witnesses acknowledged that 40% of the bonus incentives, their largest single component, was based on achieving financial performance goals. RR at 239a, 257a, 272a-73a. The trial court made no finding of the percentage relationship between potential bonuses and base salaries. However, even accepting, *arguendo*, Hospital's assertion that the financial performance component was 40% rather than 70% of the bonus incentive, we nonetheless conclude that tying 40% of incentive bonuses to financial performance is substantial, as discussed below.

Further, according to the trial court, "[H]ospital's expert witness on compensation . . . testified that this incentive compensation plan was specifically designed to impact the behavior of the employees and management team. The plan was to focus their attention on the incentive compensation to drive their behavior to make more money." Trial Ct. Op. at 35-36. The trial court found "[i]t was very clear from the testimony of all the witnesses that the health system was set up to be profitable and to reward executives at all levels when it was. Its goal went far beyond self-support." *Id.* at 36.

Hospital justified its compensation incentives by asserting that otherwise it could not attract and retain qualified executives. Trial Ct. Op. at 36; RR at 232a (stating that Tower Health wanted to retain the hospitals' existing executive teams "for integration and continuity" after purchasing the CHS hospital properties), 246a & 252a-53a (explaining that to retain Tower Health's executives and insure "leadership stability" after the CHS purchase, they needed to be compensated for the

"heavy lift" of integrating the purchased hospitals) & 453a-54a (explaining that retention arrangements for healthcare executives are important because of high demand in the market and a lack of candidates with the necessary skill sets). The trial court found insufficient support for Hospital's assertion. Trial Ct. Op. at 36. Instead, the trial court rejected Hospital's reasonableness argument regarding Tower Health's executive salaries in scathing terms:

> The evidence demonstrated that [the CEO] and the Board of Tower Health were no more tha[n] corporate health care raiders. No one questioned the executives of Tower Health for what they were being paid $2,500,000 per year or why they drained $22,000,000 per year from, for example, Phoenixville Hospital. Within three weeks of trial, Tower [Health] dismissed as employees the President of [Hospital] and Brandywine Hospital along with other executives and announced that [Hospital] would close. Other [h]ospitals have been sold, are for sale, or will just be given away as seems will be the case with Brandywine Hospital. The goal as evident from the financial documentation offered at trial was simple and direct – drain the juice out of the hospitals until there was nothing left but a dried-out husk and then leave, close the doors, or sell what was left. [Hospital] is now closed, Brandywine for sale and while this harvesting strategy may not have killed Phoenixville, it is left with little more than a skeleton.

*Id.* at 36-37.

In *Dunwoody Village*, this Court explained that the requirements of the *HUP* test are separate from those of Act 55. 52 A.3d at 422 (explaining that "an entity seeking a tax exemption as an institution of purely public charity must first meet the constitutional requirements of the *HUP* test before the question of whether it satisfies the corresponding statutory criteria in act 55 can be addressed") (citing *Mesivtah Eitz Chaim*). For example, Act 55 requires an applicant for a tax

18

exemption to demonstrate, in part, that employee compensation "is not based primarily upon the financial performance of the institution." *Dunwoody Vill.*, 52 A.3d at 421 (quoting Section 5(c)(3) of Act 55, 10 P.S. § 375(c)(3)) (additional quotation marks omitted). However, the *HUP* test, which must be satisfied first, may preclude a tax exemption even though less than the majority of an employee's compensation is based on the institution's financial performance. *Dunwoody Vill.*, 52 A.3d at 422.

In *Dunwoody Village*, executive compensation "included incentives related to [the institution's] financial or marketplace performance," such that compensation was based "in part" on the institution's annual financial performance. 52 A.3d at 422-23. This Court observed that the CEO's maximum incentive bonus was 24% of salary and the chief financial officer's was 18-19%. *Id.* at 423. Thus, we observed that "a substantial percentage" of compensation was based on financial performance. *Id.* Notably, there was no discussion in *Dunwoody* stating how much of the bonus incentive was tied to financial performance rather than other criteria. *See id.* Nonetheless, we affirmed a lower court's decision that the institutional taxpayer "failed to establish that it operate[d] entirely free from private profit motive." *Id.* (additional citation omitted).

*Phoebe Services* concerned an application for an exemption from a business privilege tax imposed by a city ordinance. At issue was whether the nonprofit taxpayer was a "business" within the meaning of the ordinance, which defined that term as "any activity carried on or exercised for gain or profit in the [c]ity." 262 A.3d at 663. The city argued that the taxpayer operated with a profit motive because its executive compensation included bonuses based on financial performance. *Id.* at 666. This Court found cases analyzing the *HUP* test's "private

profit motive" criterion, including *Dunwoody Village*, to be instructive. *Id.* at 669. Contrary to the city's argument, however, we found the executive compensation in *Phoebe Services* was "not directly tied to the financial status of the nonprofit." *Id.* at 671. Thus, *Phoebe Services* is distinguishable from *Dunwoody Village* in this regard.

There is no bright-line test of what constitutes a substantial percentage of compensation based on financial performance. In the circumstances of this case, however, we cannot say that basing 40% of the total incentive bonus on financial performance was not substantial. Therefore, we conclude that the trial court did not err in finding Hospital failed to prove it operated free from a profit motive.

### ii. Gratuitous Services

The trial court also rejected Hospital's position that it renders a substantial portion of its services gratuitously. The trial court pointed to Hospital's own application for a sales tax exemption, in which Hospital stated it provided services to 107,340 people, of whom 82, only .076%, received free services, and 5,643, or 5.3%, received fee reductions.[11] Trial Ct. Op. at 17; RR at 732a. Hospital acknowledged that only about 5.3% of its patients received fee reductions of at least 10% of the cost of goods or services provided to them. RR at 732a. The trial court found that the percentage of uncompensated care provided by Hospital was "clearly not substantial." Trial Ct. Op. at 29. The trial court further found that Hospital's evidence of the amounts and percentages of uncompensated care compared to its total operating expenses "carrie[d] little weight" under the *HUP* test. *Id.* The trial

---

[11] The trial court's calculation of .00076% and .053% mistakenly reflects the raw quotients as percentage figures.

court's findings of fact were supported by competent evidence. *See* RR at 732a. Accordingly, we will not disturb them on appeal.

Hospital also offered testimony that it satisfied the gratuitous services requirement for a property tax exemption because of shortfalls in reimbursement received for care provided to insured patients through Medicare and Medicaid.[12] Trial Ct. Op. at 18; *see also* RR at 373a-78a. However, although a Hospital witness testified that Hospital had a master charge list reflecting the gross charge for each medical service, no such sheet was produced in evidence and no witness testified to those charges. Trial Ct. Op. at 18; *see* RR at 141a-42a. As the trial court characterized the evidence, Hospital negotiates payments with "a wide variety of third-party payors" and then incorrectly "argues that because these negotiations result in the acceptance of payments that are less than what is initially requested on the master charge sheet, which are inflated to begin with,[13] [Hospital] must be considered to have offered uncompensated care." Trial Ct. Op. at 19.

Hospital correctly asserts that reimbursement shortfalls from Medicare and Medicaid may constitute donations of gratuitous services. *See Wilson Area Sch. Dist.*, 747 A.2d at 878 (stating that "the total value of [the h]ospital's services that were rendered gratuitously to individuals . . . includ[es] traditional uncompensated charity care, Medicaid and Medicare shortfalls, and bad debt expenses"); *St. Margaret Seneca Place*, 640 A.2d at 382-83 (positing that "[o]ur prior decisions do

---

[12] The testimony given actually related specifically to Act 55 criteria, not the *HUP* test. *See* RR at 364a-73a , 380a, 384a, 388a, 393a-94a, 409a-12a, 515a & 532a. However, a gratuitous service requirement exists in both Act 55 and the *HUP* test.

[13] For example, the evidence indicated that even self-pay patients were provided "financial assistance" in the form of a discount of 75% to 100% of the master charge sheet rates. RR at 139a-41a & 152a.

not equate the acceptance of Medicaid payments as the equivalent of conducting a business for profit. The decision to accept Medicaid payments to help defray the cost of care for residents is perfectly consistent with a finding that the nursing home advances a charitable purpose."); *Lewistown Hosp. v. Mifflin Cnty. Bd. of Assessment Appeals*, 706 A.2d 1269, 1272 (Pa. Cmwlth. 1998) (stating that shortfalls in cost reimbursement by Medicare and Medicaid reflect gratuitous donation of services). However, the trial court rejected Hospital's argument that reimbursement shortfalls for Medicare and Medicaid patients constituted gratuitous services in this case. We discern no error in the trial court's determination.

First, the trial court observed that Hospital did not consider whether patients with Medicare or Medicaid coverage also had supplemental insurance to cover shortfalls in Medicare or Medicaid reimbursements.[14] Trial Ct. Op. at 20 & 30. In addition, the trial court rejected the reliance on "Trend Reports"[15] by Hospital's accounting expert, Robert Cepielik (Cepielik) to support his payment shortfall calculations; the trial court found the Trend Reports were "unreliable" and based on "numbers not properly audited." *Id.* at 30; *see also* RR at 520a & 522a. The trial court likewise rejected Cepielik's testimony that his opinion was based on "[generally accepted accounting principles (GAAP)]-like" numbers,[16] positing that

---

[14] A Tower Health witness testified that where a Medicare patient had supplemental coverage, the supplemental insurer would be billed for any deductible or coinsurance. RR at 117a-18a. However, the record does not indicate whether those patients were excluded when calculating the shortfall incurred by Hospital in payments for Medicare patients. *See, e.g.*, *id.* at 120a (stating that Hospital's statement of revenue for Medicare reimbursement would not include additional revenue that may have been received from a patient's supplemental insurance).

[15] Robert Cepielik (Cepielik) used the Trend Reports to identify gross charges for Medicaid recipients. RR at 421a-22a.

[16] When asked whether he followed GAAP in calculating the amount of Hospital's uncompensated care, Cepielik hedged in acknowledging that the financial information on which

22

he relied was not GAAP information. *See, e.g.*, RR at 399a-400a (stating that Cepielik used statistical figures that were "not GAAP dollars, but statistics go into making GAAP estimates"), 400a-01a (explaining that his process was different from an audit that would be used to opine that a financial statement was in accordance with GAAP, but "the types of information that one uses that [Cepielik] used to do this calculation are very common and use this information in conducting audits, albeit for a different purpose"), 401a-02a (opining that his estimate of Medicare reimbursement rates was "using a GAAP concept" and was "a good and faithful estimate of GAAP principles"), 403a-04a (explaining that an audit of the financial statement would generate an opinion whether management followed GAAP, but Hospital did not have an audited financial statement). The following colloquy during cross-examination is emblematic of Cepielik's equivocal testimony about his reliance on non-GAAP figures:

> Q     Is it your testimony that . . . all the items that you referred to in your testimony as estimates, that those estimates are in accordance with GAAP?
>
> A     So if I recall the words in there and the way I interpret those as an accountant, you have to come up with a value. And I estimated a value based upon accounting, [GAAP] principles. Yes.
>
> Q     But you relied on estimates provided by other, third parties, like the Wisconsin Physicians Services letter has a percentage in it that you relied upon?
>
> A     Yes.
>
> Q     Do you know if that number is prepared or created in accordance with GAAP?
>
> A     That number comes off of the Medicare Cost Report, so I viewed it as a similar principle number that I used in my estimate.
>
> Q     I understand that. You've expressed confidence in that number. But in terms of GAAP, is that percentage and that source, is that prepared in accordance with GAAP?
>
> A     Is that a GAAP number? No, it's prepared in accordance with Medicare Cost Reports. It's ultimately prepared in accordance with the regulations and rules of the Medicare Cost Report.
>
> Q     Separate and apart from GAAP?
>
> A     Correct.

23

"[t]here is no such thing. This is a binary selection. Figures relied upon either were or were not prepared in accordance with GAAP. These were not."[17] *Id.*; *see also* RR at 520a-21a & 523a.

Moreover, in considering whether Hospital's gratuitous services relieved the government of some of its burden, the trial court observed that Medicare reimburses about 9% of the master charge sheet amounts, while Blue Cross pays only 5.73% of such amounts. Trial Ct. Op. at 32. The trial court found that "[a] clear financial reason to take more government insurance patients is the higher reimbursement rate." *Id.* The trial court reasoned further:

> The testimony and data clearly lead to a conclusion that the government is assuming more of [the] obligation or burden to provide health care. One could conclude that in 1985, the Supreme Court recognized in *HUP* that if the government was only paying for 11% of the population's health care, a given hospital [was] relieving the government of 89% of its burden. In 2019, the government was now paying nearly one-half of the population's health care costs. Rather than relieving the government of a burden, [Hospital's] financial model in place is to increase [the] burden on the government and reliance on government insurance payments.

---

Q    So the Medicare Standards don't necessarily impose GAAP on the Medicare Cost Report results, do they?

A    No. It's not a GAAP number.

*Id.* at 407a-08a.

[17] We note that the specific recognition of GAAP calculations, like that of calculating gratuitous services as a percentage of operating expenses, is found in Act 55 rather than expressly required under the *HUP* test. *See* 10 P.S. § 375(f)(3). The trial court acknowledged as much in its discussion of GAAP in relation to the *HUP* test. Trial Ct. Op. at 30 n.2.

*Id.* at 31-32 & nn.3-4 (first citing Health Care Fin. Rev., 1992[18]; and then citing U.S. Census Bureau Current Population Survey, 2020 Annual & Economic Supplement). In addition, the trial court found that the evidence showed the costs listed on the master charge sheet were "meaningless" and that "the reimbursement percentage stated above is likely higher or is closer to actual costs of services."  Trial Ct. Op. at 32; *see also* RR at 139a-41a  & 152a (testimony by Hospital's Financial Counselor that she did not know how master charge amounts were established, but self-pay patients received discounts of 75%-100% from those amounts).  The trial court reasoned:

> There was no testimony as to the cost of a procedure or what any of the now multiple insurance plans pay for that procedure.  That information was solely within the control of [] Hospital.  It could have produced the agreements and financial arrangements, under a confidentiality agreement if necessary, thus allowing a proper analysis[,] but it did not.  The conclusion left to be reached is that such information would not support [Hospital's] exemption argument.  Although uncompensated Medicare costs may be considered in an exemption analysis, the evidence offered at trial leaves the court merely to speculate as to the amounts of uncompensated care.

Trial Ct. Op. at 32-33.

The trial court similarly found Hospital failed to establish that its bad debt write-offs constituted gratuitous donations of care for tax exemption purposes. Although Hospital offered expert testimony concerning the amount of bad debt

---

[18] The Health Care Financing Review was a journal "released from 1979 and 2009 with the goal of presenting information and analyses on a broad range of health care financing and delivery issues to improve the understanding of the Medicare and Medicaid Programs and the U.S. health care system"; it is currently archived on the website of the Centers for Medicare & Medicaid Services.  *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Archives/HCFR (last visited Feb. 9, 2023).

write-offs, there was no evidence concerning the reason for nonpayment or whether any patients whose debts were written off actually had the means to pay. *See* RR at 108a-09a (stating that patients who are "uncooperative or don't pay their bill" are not sued in order to collect), 112a-13a (stating that any debt not paid by the patient is written off) & 123a (stating that "the large majority" of self-pay patients either are "just making too much money" to qualify for assistance or are "uncooperative," and Hospital voluntarily chooses not to pursue legal action for collection). The trial court explained that write-offs for patients who have the financial means to pay "is not charity when [H]ospital decided not to pursue the collection of these accounts"; thus, Hospital's ever increasing []bad debt[] write-offs do not equal an increase in donated care, to those []who otherwise could not afford to pay." Trial Ct. Op. at 33 (additional quotation marks omitted).

We agree with the trial court that Hospital failed to show the amount of gratuitous services it provided because it did not provide information concerning whether patients receiving free, discounted, or unreimbursed services actually had the ability to pay the full costs. Although inability to pay is not expressly part of the *HUP* test, it was recognized as relevant to gratuitous services in *St. Margaret Seneca Place*. *See* 640 A.2d at 384; *accord Dunwoody Vill.*, 52 A.3d at 421 (affirming a finding that the operator of a nonprofit retirement community failed to demonstrate that it relieved the government of part of its burden, where most of its residents could afford to pay the applicable fees and costs). We conclude that the trial court did not err in determining that gratuitous services to persons who can afford to pay do not satisfy any factor of the *HUP* test.

26

### 3. Act 55 Factors

### a. Legal Requirements

The requirements of Act 55 are similar but not identical to those of the *HUP* test. The statement of legislative purpose of Act 55, set forth in Section 2(b), provides in full:

> It is the intent of the General Assembly to eliminate inconsistent application of eligibility standards for charitable tax exemptions, reduce confusion and confrontation among traditionally tax-exempt institutions and political subdivisions and ensure that charitable and public funds are not unnecessarily diverted from the public good to litigate eligibility for tax-exempt status by providing standards to be applied uniformly in all proceedings throughout this Commonwealth for determining eligibility for exemption from State and local taxation which are consistent with traditional legislative and judicial applications of the constitutional term "institutions of purely public charity."

10 P.S. § 372(b); *see also WRC N. Fork Heights, Inc. v. Bd. of Assessment Appeals*, 917 A.2d 893, 907 n.15 (Pa. Cmwlth. 2007). Consequently, Act 55's requirements are specified in much greater detail than the *HUP* test provides.

Section 5(a) of Act 55, 10 P.S. § 375(a), requires an entity seeking a tax exemption as an institution of purely public charity to satisfy Sections 5(b) through 5(f). Although Section 5 is lengthy, the following provisions are most pertinent here:

> (c) PRIVATE PROFIT MOTIVE.—The institution must operate entirely free from private profit motive. Notwithstanding whether the institution's revenues exceed its expenses, this criterion is satisfied if the institution meets all of the following:
>
> > (1) Neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals . . . .

27

. . . .

(3) Compensation, including benefits, of any director, officer or employee is not based primarily upon the financial performance of the institution.

. . . .

(f) GOVERNMENT SERVICE.—The institution must relieve the government of some of its burden. This criterion is satisfied if the institution meets any one of the following:

(1) Provides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service.

. . . .

(3) Receives on a regular basis payments for services rendered under a government program if the payments are less than the full costs incurred by the institution, as determined by generally accepted accounting principles.

. . . .

10 P.S. § 375(c)(1) & (3) & (f)(1) & (3).

### b. Analysis

For this test, the trial court opined that Hospital focused solely on the "community service" factor. Trial Ct. Op. at 39-40. Reiterating the Act 55 requirement that calculations be based on GAAP, 10 P.S. § 375(f)(3), the trial court rejected Cepielik's calculations as noncompliant, as it had under the *HUP* test, because they were based on "GAAP-like" or "non-GAAP numbers."[19] *Id.* at 40.

---

[19] The trial court did not separately discuss other Act 55 factors, instead referring generally to its *HUP* discussion. Trial Ct. Op. at 39-40.

28

The trial court suggested Cepielik could and should simply have obtained audited financial statements, which are prepared in accordance with GAAP. *Id.* Therefore, the trial court inferred from the failure to produce or use such reports that they would have been unfavorable to Hospital's position. *Id.*

The trial court found Hospital failed to demonstrate that it applied GAAP in calculating its financial evidence. Trial Ct. Op. at 30. We discern no error in the trial court's finding. Therefore, we agree with the trial court that Hospital failed to demonstrate compliance with Act 55's requirements.

### 4. CCAL Factors

### a. Legal Requirements

The CCAL "is to be read *in para materia* with" Act 55; Act 55 supersedes any inconsistent provision of the CCAL. 53 Pa.C.S. § 8812(c).

Under Section 8812(a)(3)(i) and (iii) of the CCAL, any hospital that is "founded, endowed, and maintained by public or private charity" is exempt from county and local taxes so long as the following apply:

> (i) The entire revenue derived by the entity is applied to support the entity and to increase the efficiency and facilities of the entity, the repair and the necessary increase of grounds and buildings of the entity and for no other purpose.

> (ii) The property of purely public charities is necessary to and actually used for the principal purposes of the institution and not used in such a manner as to compete with commercial enterprise.

53 Pa.C.S. § 8812(a)(3)(i) & (ii). The CCAL applies to all second class A through eighth class counties. Chester County is a third class county.

29

**b. Analysis**

The trial court limited its discussion of the CCAL to Section 8812(b)(1), which renders real property subject to taxation if "any income or revenue is derived, other than from the recipients of the bounty of the institution or charity." 53 Pa.C.S. § 8812(b)(1); Trial Ct. Op. at 41. The trial court did not separately discuss other CCAL factors, referring instead generally to its *HUP* and Act 55 discussions. Trial Ct. Op. at 41.

The trial court found that Hospital derived income from other than the recipients of its bounty because non-employee physicians with privileges at Hospital are part of for-profit medical practices and bill patients directly for their services. Trial Ct. Op. at 41. Moreover, Hospital pays some independent contractor physicians to provide services in operating and emergency rooms; the trial court found that the income used to pay these physicians "was not derived from the recipients of [H]ospital's services." *Id.* at 41-42. The trial court concluded that allowing physicians from for-profit practices to have staff privileges at Hospital's facility violates the CCAL.

We question the trial court's reasoning on this issue. Section 8812(b)(1) of the CCAL, cited by the trial court, renders taxable "all property from which any income or revenue is derived, other than from the recipients of the bounty of the institution or charity." 53 Pa.C.S § 8812(b)(1). The trial court interpreted this provision to mean that "[H]ospital cannot use property it owns to derive[] income from sources other than patients." Trial Ct. Op. at 41. However, it is unclear how the trial court thought Hospital received such income. Where third-party physicians who are members of for-profit medical practices serve patients at Hospital's facility pursuant to their staff privileges, the patients pay the doctors, not Hospital, for those

30

services.  *Id.*  In addition, those patients are also Hospital patients paying separately for Hospital's services, so any patient payments made to the third-party doctors are still being paid by the recipients of Hospital's bounty.  To the extent that Hospital purchases some physician services from a medical group owned by Tower Health, the trial court did not explain how that constitutes income or revenue to Hospital.

For these reasons, we believe the trial court erred in finding that Hospital derived income other than from the recipients of its bounty.  However, because we have determined that the trial court correctly found Hospital failed to meet the requirements of the *HUP* test and Act 55, any error in the trial court's analysis under the CCAL was harmless.

**D. Improper Consideration of Expert Testimony**

Hospital argues that the trial court erred in considering the testimony of the taxing bodies' expert witness, Bruce Loch (Loch), because his testimony improperly offered legal conclusions and those conclusions were contrary to existing law.  Hospital's Br. at 30-38.  Because the trial court's opinion, which decided the tax exemption applications of all three LLCs, was consistent with Loch's assertions, Hospital infers that the trial court must have relied improperly on Loch's testimony in reaching its own legal conclusions.  *See id.*  We believe this inference is largely unsupported by the record, and further, any error the trial court may have made was insufficient to require reversal of its decision.

Regarding the connection between executive bonuses and financial performance, Hospital correctly observes that the trial court relied on Loch's testimony that 70% of Hospital's executive bonus incentives were tied to financial performance goals.  *See* Trial Ct. Op. at 35 (citing Loch's testimony as the source of

31

the 70% figure). Hospital challenges Loch's analysis of the effects of financial performance on executive bonus incentives, which included the effect of a "circuit breaker" developed by Tower Health that allowed Tower Health to reduce or eliminate bonuses where threshold financial goals were not achieved. In Hospital's view,

> the circuit breaker was not a goal: even if Tower Health's year-end financial performance finished above the circuit breaker activation level, no incentive compensation was awarded unless Hospital achieved the individual performance criteria set for that year . . . . In short, the circuit breaker did not serve to increase compensation but only to reduce compensation.

Hospital's Br. at 15-16. Thus, Hospital seeks to draw a distinction between bonus incentives, which allowed executives to receive bonuses for achieving financial goals, and the circuit breaker, which allowed Tower Health to reduce or eliminate bonuses where threshold financial goals were not achieved. Further, Hospital argues that it did not rely substantially on financial performance in awarding executive bonuses because application of the circuit breaker actually resulted in *no* executive bonuses during most of the tax years at issue because of the COVID-19 pandemic. *See* Hospital's Br. at 60-61 & n.38.

> The trial court rejected these arguments, explaining:

> The bonus compensation plan remained in place, whether paid or not. The fact that the executive compensation plan was suspended only further serves to emphasize that [H]ospital did not operate entirely free from private profit motive. Contrary to [H]ospital['s] arguments, the "circuit breaker" demonstrates that a bad year resulted in financial consequences to the executives. Whereas a good year or a "profitable" year resulted in large payouts to selected people.

Trial Ct. Op. at 37; *see also* RR at 528a.[20]  We discern no error in the trial court's reasoning.  While 40% of the bonus incentive was directly tied to financial goals, Tower Health also retained the power to reduce or eliminate the remaining portion of the bonus incentive where threshold financial goals were not met, thus effectively tying *all* bonus incentives to financial performance, not just the 70% posited by Loch.

Moreover, as stated above, Hospital itself acknowledges that 40% of the bonus incentives, their largest single component, was based on achieving financial performance goals.  RR at 371a, 373a, 739a & 746a.  Hospital does not specifically assert that basing 40% of the bonus incentives on financial performance goals would comply with the *HUP* test or Act 55.  Instead, Hospital suggests that the proper calculation is the percentage of an executive's *overall* compensation package that is tied to financial performance and argues *that* percentage is not substantial.  *See* Hospital's Br. at 16-17 & 59-60; *see also* RR at 369a-70a; *accord* RR at 433a (testimony that Hospital's expert "calculate[ed] bonus compensation as a percentage of overall compensation for everybody employed at . . . Hospital," not as a percentage of Hospital executives' compensation).  The trial court obviously rejected Hospital's argument, and we cannot say that rejection was error.

Next, regarding the flaws in Cepielik's testimony based on non-GAAP calculations, as discussed above, there was competent record evidence to support the

---

[20] In addition, we note that one of Hospital's compensation experts opined, regarding why executive incentives are partly based on financial performance, that "the primary reason is that an institution needs to be financially sustainable to meet its charitable mission, so that if there is no ability to generate financial margins, there is not an ability to serve the community, deliver care, provide charitable care, keep the doors open . . . ."  RR at 268a.  This may be a sound business strategy, but it is directly contrary to the requirements of the *HUP* test and Act 55 that executive compensation must *not* be tied to the entity's financial performance if the entity is to qualify for a tax exemption as a nonprofit organization.

trial court's conclusion on the GAAP issue without reliance on Loch's testimony. Indeed, the trial court did not mention Loch's testimony in its GAAP discussion; rather, the trial court's discussion of the GAAP issue related solely to information elicited from Cepielik on cross-examination. *See* Trial Ct. Op. at 30 & 40.

For these reasons, we conclude that, in the context of the trial court's overall reasoning, its allowance of Loch's testimony was, at most, harmless error.

### E. Application to Strike Brief of *Amici*

Hospital filed an application for relief asking this Court to strike the briefs of *amici* Patientrightsadvocate.org and Families USA on the basis that the briefs relied on matters that were outside the record or raised issues that were not preserved. This Court does not consider evidence outside the record. *See Tennyson v. Zoning Hearing Bd. of W. Bradford Twp*., 952 A.2d 739 (Pa. Cmwlth. 2008) (stating that assertions outside of the record may not be considered on appeal). Further, we do not consider any legal arguments not preserved by the parties and *amici* may not assert such arguments. *See Stilp v. Commonwealth*, 905 A.2d 918, 928 n.14 (Pa. 2006) (noting that *amici* must take the issues as raised by the parties and cannot inject new issues that the parties have not preserved). Therefore, we have not considered any extra-record information contained in the briefs filed by the *amici*. Accordingly, we dismiss Hospital's application for relief as moot.

### IV. Conclusion

Based on the foregoing analysis, we grant the Board's applications for relief and dismiss Hospital's appeals because Hospital's noncompliance with Rule 1925(b)(4), Pa. R.A.P. 1925(b)(4), resulted in waiver of all issues on appeal. We

34

dismiss as moot Hospital's applications to strike the briefs of *amici* Patientrightsadvocate.org and Families USA.


_____
CHRISTINE FIZZANO CANNON, Judge


Judge Wallace did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jennersville Hospital, LLC,      :     CASES CONSOLIDATED
           Appellant          :
                         :
          v.              :
                         :
County of Chester Board of       :
Assessment Appeals, Avon Grove :     Nos. 1282 & 1286 C.D. 2021
School District and Penn Township :

# O R D E R

AND NOW, this 10th day of February, 2023, the applications for relief of the County of Chester Board of Assessment Appeals are GRANTED and the appeals of Jennersville Hospital, LLC (Hospital) are DISMISSED. Hospital's applications to strike the briefs filed by Patientrightsadvocate.org and Families USA as *amici curiae* are DISMISSED AS MOOT.

_____
CHRISTINE FIZZANO CANNON, Judge